EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Vivian Meléndez Rivera<br>    Demandante-Recurrida<br><br>           v.<br><br>Asociación Hospital del Maestro<br>   Demandada-Peticionaria | Certiorari<br><br>2002 TSPR 60<br><br>156 DPR _____ |

Número del Caso: CC-2000-673


Fecha: 10/mayo/2002


Tribunal de Circuito de Apelaciones:
                    Circuito Regional I


Juez Ponente:
                    Hon. Lady Alfonso de Cumpiano


Abogados de la Parte Peticionaria:
                    Lcdo. George E. Green Rodríguez
                    Lcda. Marcelle D. Martell Jovet


Abogada de la Parte Recurrida:
                    Lcda. Jennie Rabell


Materia: Daños y Perjuicios


Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Vivian Meléndez Rivera

    Demandante-Recurrida

       vs.                  CC-2000-673      Certiorari

Asociación Hospital del
Maestro

    Demandante-Peticionaria

**Opinión del Tribunal emitida por el Juez Asociado SEÑOR FUSTER BERLINGERI.**

San Juan, Puerto Rico, a 10 de mayo de 2002.

Tenemos la ocasión para expresarnos en torno a la aplicación de varias disposiciones de la llamada Ley de Protección de Madres Obreras, 29 L.P.R.A. secs. 467-474, que no habíamos interpretado antes, relativas éstas al discrimen **durante** el embarazo y al periodo de descanso postnatal que provee dicha legislación. También debemos dilucidar la aplicación con respecto a este último asunto de lo dispuesto en la Ley de Beneficio por Incapacidad Temporal (en adelante SINOT).

I

El 23 de mayo de 1994, la recurrida Vivian Meléndez Rivera (Meléndez) comenzó a trabajar con

un nombramiento probatorio como terapista respiratoria en el Hospital del Maestro (Hospital), una entidad sin fines de lucro que existe primordialmente para facilitar servicios médico-hospitalarios al magisterio del país. El 20 de agosto de 1994, fue nombrada empleada regular.

Al comienzo de su empleo, Meléndez trabajaba turnos rotativos y hacía relevos, **al igual que los otros terapistas respiratorios del Hospital**. Meléndez laboraba en **horarios o turnos rotativos**, por ejemplo, de 3:00 p.m. a 11:00 p.m.; o de 11:00 p.m. a 7:00 a.m. El relevo significaba que una vez terminado su turno, el terapista esperaba a que la persona que tenía asignado el próximo turno llegase al trabajo y lo comenzara. Si ésta no llegaba, el terapista que había completado su turno debía permanecer en el Hospital y continuar trabajando como relevo del que no compareció a realizar su turno.

Luego de llevar algún tiempo en su empleo, el médico que era director del Departamento de Terapia Respiratoria del Hospital le asignó a Meléndez un turno fijo de trabajo de 3:00 p.m. a 11:00 p.m. Este turno le permitía viajar a su trabajo con más comodidad desde su residencia en Ponce. **En dicho turno fijo, Meléndez también debía realizar relevos**. El 24 de abril de 1995 Meléndez fue nombrada jefa del grupo de terapistas del turno referido, por el mismo médico director departamental mencionado antes, en reconocimiento de su buen desempeño profesional. Sin embargo, aun en ese cargo conservaba la responsabilidad de **relevar turnos** cuando ello fuera necesario porque como jefa del grupo aludido le correspondía atender cualquier dificultad o situación que

surgiese con respecto a la prestación del servicio de terapia respiratoria en el Hospital. Aun en el turno fijo, pues, existía la posibilidad de tener que trabajar **turnos dobles** ocasionalmente, de surgir la necesidad de realizar un relevo.

Mientras se encontraba laborando en el Hospital, Meléndez conoció a Alberto Hernández Santiago (Hernández) quien también trabajaba en el Hospital. Estos comenzaron una relación amorosa y posteriormente comenzaron a convivir. En abril de 1995 Meléndez quedó embarazada de Hernández. **Este era su quinto embarazo, de los cuales tres se habían malogrado por una condición seria de hipertensión asintomática, que causaba que los fetos murieran asfixiados en su vientre por razón de súbitos y dramáticos aumentos en su presión arterial.**[1] Al ser una condición asintomática, ésta requería cada vez más medidas de precaución durante el embarazo.

El primer trimestre del embarazo de Meléndez transcurrió en relativa normalidad. Debido al alto riesgo de perder su embarazo y la necesidad de tener atenciones médicas rápidas, Meléndez comenzó a atenderse con un obstetra que tenía oficinas aledañas al Hospital. Además, ella continuaba su tratamiento con dos ginecólogos-obstetras con oficinas en Ponce.

Posteriormente, Meléndez comenzó a confrontar de nuevo complicaciones con su embarazo, tales como hipertensión, ansiedad, anemia, náuseas y vómitos. No obstante, continuó trabajando en el Hospital porque podía recibir ayuda médica inmediata allí de surgir alguna emergencia. En efecto, en varias

ocasiones durante este tiempo tuvo que ser hospitalizada por unos pocos días y recibir asistencia médica en **el propio Hospital.**[2] Estas breves hospitalizaciones y otras causaron **que Meléndez ocasionalmente se ausentara de su empleo para recibir tratamiento médico**. Por motivo de dichas ausencias y de otras tardanzas, a partir del 9 de octubre de 1995, su supervisora inmediata, la gerente de terapia respiratoria del Hospital, le cambió su jornada de trabajo reasignándole turnos rotativos en lugar del turno fijo que tenía antes. El 2 de octubre de 1995, el personal médico de la sala de emergencia del Hospital le ordenó descanso a Meléndez y le prohibió los relevos y por ende, la posibilidad de turnos dobles. A partir del 2 de octubre de 1995, como cuestión de hecho, Meléndez no realizó relevo alguno.

En la tercera ocasión que Meléndez fue hospitalizada, cuando ésta le mostró el certificado médico a su supervisora, ésta expresó con disgusto que no reclutaría más mujeres jóvenes y solteras porque se enamoraban y venían con problemas de embarazo. El 29 de octubre de 1995 Meléndez fue hospitalizada nuevamente en el Hospital por complicaciones con el embarazo. El 6 de noviembre de 1995 Meléndez solicitó los beneficios de SINOT[3] por su problema de **hipertensión**, y a partir de esa fecha no regresó a su trabajo en el Hospital.

Debe resaltarse que efectivo el **1 de diciembre de 1995** Meléndez recibió un aumento de sueldo de $45.00 mensuales, para

---

[1] De los cuatros embarazos previos, sólo le nació viva una niña, la cual actualmente es una adolescente.

[2] Véase sentencia del Tribunal de Primera Instancia, determinaciones de hecho números 58, 59 y 64.

un total de $845, más la bonificación correspondiente al turno de trabajo; y que **posteriormente** recibió otro aumento de $115 que subió su salario a $960 mensuales, más la bonificación referida.

El 2 de febrero de 1996 Meléndez dio a luz mediante cesárea. Las partes estipularon que a partir de esa fecha Meléndez disfrutó de la correspondiente licencia de maternidad, y que ésta vencía el **28 de marzo de 1996**. Después del parto Meléndez continuó sufriendo molestias por una condición conocida como "carpal tunnel syndrome" que supuestamente había comenzado a sufrir durante el embarazo.

Dos meses después de dar a luz, el 28 de marzo de 1996, Meléndez le llevó a su médico los formularios de solicitud para beneficios adicionales bajo SINOT, por razón de que continuaba sufriendo de la **condición de "carpal tunnel syndrome"**. En la referida solicitud de beneficios, el doctor de Meléndez indicó **que era una condición no relacionada con el embarazo.**

**El 29 de marzo de 1996**, Meléndez le presentó al Hospital, su patrono, un certificado médico mediante el cual se recomendaba que ella disfrutase de descanso adicional por la incapacidad que sufría por razón del "carpal tunnel syndrome". También le presentó al patrono otra solicitud de beneficios al amparo de SINOT.

El 3 de abril de 1996 el Hospital le envió una carta a Meléndez en la cual le notificaba que debía reintegrarse a su empleo en el término de tres días o justificar sus ausencias.

---

[3] Ley Núm. 139 de 26 de junio de 1968, 11 L.P.R.A. sec. 203

Meléndez entonces se comunicó con el Director de Recursos Humanos del Hospital y le reiteró que estaba incapacitada y acogida a SINOT. Este le contestó que tenía duda respecto al certificado médico que ella había presentado debido a que entendía que la condición de "carpal tunnel syndrome" no era consecuencia del embarazo. Meléndez continuó su ausencia del trabajo.

El 23 de abril de 1996 el Hospital despidió a Meléndez por abandono del trabajo. Esta se encontraba recibiendo los beneficios de SINOT.

El 12 de diciembre de 1996, Meléndez y su compañero Hernández presentaron una demanda de daños y perjuicios contra el Hospital y alegaron, en esencia, que éste había incurrido en discrimen por razón de embarazo.[4]

Mediante una sentencia de 30 de agosto de 1999, el Tribunal de Primera Instancia determinó que el discrimen por embarazo había quedado establecido. En vista de ello, el tribunal le ordenó al Hospital el pago de $75,000 por los daños y perjuicios sufridos por Meléndez, más una suma igual al doble de esa cantidad ($150,000) en virtud de la penalidad dispuesta en la Ley de Protección de Madres Obreras, *supra*. Además, ordenó la reinstalación de Meléndez en la plaza que ocupaba como Terapista Respiratoria en su horario regular, así como el pago de todos los salarios y haberes dejados de recibir desde su despido ilegal y cualquier aumento de sueldo, bono, estipendio que hubiese

---

et seq.

[4] El 24 de septiembre de 1997, la demanda fue enmendada para incluir los beneficios que provee SINOT y el pago de los salarios dejados de percibir por la terapista hasta su reinstalación en el Hospital.

tenido derecho a recibir. A este pago sobre salarios retroactivos, se añadiría una suma igual al doble de ella por concepto de penalidad. Mas aún, el tribunal le otorgó a Hernández la suma de $10,000 por los daños y angustias mentales sufridas. Finalmente, además de imponer el pago de costas, el foro de instancia fijó $18,750 de honorarios de abogado a favor de los demandantes.

Inconforme con este dictamen, el Hospital acudió al Tribunal de Circuito de Apelaciones. Este confirmó la sentencia apelada.

El Hospital entonces acudió ante nos y señaló la comisión de los siguientes errores:

A.  Erró como cuestión de derecho el Honorable Tribunal de Circuito de Apelaciones al determinar que la parte peticionaria discriminó contra la parte recurrida por razón de su estado de embarazo mientras ésta se encontraba trabajando.

B.  Erró como cuestión de derecho el Honorable Tribunal de Circuito de Apelaciones al determinar que la parte recurrida fue despedida en violación de las disposiciones de reserva de empleo de la Ley 3 del 13 de marzo de 1942 conocida como La Ley para la Protección de las Madres Obreras.

C.  Erró como cuestión de derecho el Honorable Tribunal de Circuito de Apelaciones al determinar que la prueba permitida por el Honorable Tribunal de Primera Instancia sobre comentarios y conducta de la supervisora era de carácter discriminatorio cuando éstos fueron objetados oportunamente ya que no formaron parte de la teoría de la demanda y lo cual ocasionó que se hicieran determinaciones de hechos adversos a la parte peticionaria.

D.  Erró como cuestión de derecho el Honorable Tribunal de Circuito de Apelaciones al determinar que la causa de acción bajo la Ley de Seguridad por Incapacidad no Ocupacional (SINOT) no estaba prescrita.

   E.  Erró como cuestión de derecho el Honorable
       Tribunal de Circuito de Apelaciones al sostener
       las partidas de daños concedidas a la parte
       demandante aun cuando no existe base en el récord
       y los daños concedidos no guardan relación con
       toda la prueba documental sometida.

El 1 de diciembre de 2000, en reconsideración, expedimos el auto de Certiorari solicitado por el peticionario, Hospital del Maestro, a los fines de revisar la sentencia dictada por el foro apelativo el 27 de junio de 2000. Luego de varias prórrogas, la parte peticionaria presentó su alegato el 1 de mayo de 2001; la parte recurrida presentó el suyo el 30 de mayo de 2001.

Con el beneficio de ambas comparecencias, pasamos a resolver.

## II

La sección 4 de la Ley de Protección de Madres Obreras, Ley Núm. 3 de 13 de marzo de 1942, *supra*, según enmendada, (en adelante la Ley Núm. 3), establece que: "El patrono no podrá, sin causa justa, **despedir a la mujer embarazada.** No se entenderá que es justa causa el menor rendimiento para el trabajo, en razón del embarazo." (Énfasis suplido).

La Ley Núm. 3, *supra*, protege a la mujer en su derecho a continuar en el empleo y a **que no se le despida arbitrariamente durante la etapa de gestación.** De esa manera se evitan las consecuencias socioeconómicas que durante el embarazo y después de éste podría conllevar tal despido. Rivera Aguila v. K-Mart de P.R., 123 D.P.R. 599, 608 (1989).

Al amparo de la referida Ley, una vez entablada una acción por la obrera, mediante la cual se haya reclamado un resarcimiento

por haber sido **despedida de su empleo sin justa causa mientras estaba embarazada**, el patrono viene obligado a alegar en su contestación los hechos que motivaron el despido. Es al patrono que alegue como defensa que medió justa causa para el despido, a quien le corresponde probar, mediante la preponderancia de la evidencia, que el despido estuvo justificado. El peso de la prueba se desplaza de la obrera demandante hacia el patrono demandado, y es sobre éste que recae el "onus probandi". Artículos 2 y 8 de la Ley Núm. 80 de 30 de mayo de 1976, según enmendada, 29 L.P.R.A. secs. 185b y 185h; Hawayek v. A.F.F., 123 D.P.R. 526 (1989); Srio. del Trabajo v. I.T.T., 108 D.P.R. 536, 546 (1979).

La referida sección 4 de la Ley Núm. 3, en su segundo párrafo, también prohíbe que se:

> "despida, suspenda, reduzca el salario, o discrimine en cualquier forma contra una trabajadora por razón de la merma en su producción mientras ésta se encuentre en estado de embarazo..."

Esta disposición fue añadida mediante una enmienda a la legislación de protección a madres obreras, efectuada en 1969. Su propósito fue asegurar que la madre obrera embarazada no fuese despedida o sufriese discrimen por el menor rendimiento en el trabajo por efectos del embarazo. Soc. de Gananciales v. Centro Gráfico, 144 D.P.R. 952, 959 (1998).

Por otro lado, la sección 2 de la Ley Núm. 3, también dispone, en lo pertinente, que:

> Las obreras en estado grávido tendrán derecho a un descanso que comprenderá cuatro (4) semanas antes del alumbramiento y cuatro (4) semanas después. La obrera podrá optar por tomar hasta sólo una (1) semana de descanso prenatal y extender hasta siete (7) semanas el descanso postnatal al que tiene derecho siempre que

se le presente a su patrono una certificación médica acreditativa de que está en condiciones de trabajar hasta una (1) semana antes del alumbramiento.

\* \* \* \* \*

Será obligación del patrono, asimismo, pagar a las madres obreras la totalidad del sueldo, salario, jornal o compensación que estuviere recibiendo por su trabajo durante el mencionado período de descanso.

\* \* \* \* \*

En el caso de la maternidad por alumbramiento producido antes de transcurrir las semanas de haber comenzado la obrera embarazada su descanso prenatal o sin que hubiere comenzado éste, la obrera podrá optar extender el descanso postnatal por un período de tiempo equivalente al que dejó de disfrutar durante el período prenatal y también le será pagado a sueldo completo.

\* \* \* \* \*

Si a la obrera le sobreviene alguna complicación postnatal que le impidiere trabajar por un término que exceda de cuatro (4) semanas, a contar desde el día del alumbramiento, el patrono estará obligado a ampliar el período de descanso por un término que no excederá de doce (12) semanas adicionales, siempre que antes de expirar el período de descanso se le presente certificación médica acreditativa de tales hechos. En este caso, la obrera no tendrá derecho a recibir compensación adicional pero se le reservará el empleo.

Como puede observarse, del texto claro de la citada sección 2, surge que la obrera embarazada tiene **de ordinario** derecho a disfrutar de un descanso **prenatal** con paga de cuatro (4) semanas antes del alumbramiento y a otro descanso igual **postnatal**. Se trata de lo que se conoce comúnmente como la licencia por maternidad, de un total de ocho (8) semanas, durante la cual no sólo tiene derecho a continuar recibiendo la totalidad de su sueldo sino, además, a que se le reserve su empleo durante su ausencia.

La disposición referida también establece otros dos modos alternos para distribuir las ocho semanas de descanso que le otorga la Ley Núm. 3. Así pues, si la obrera embarazada está en condiciones para trabajar y desea hacerlo, puede optar por tomar hasta sólo una (1) semana de descanso prenatal, para extender luego hasta siete (7) semanas el descanso postnatal. Por otro lado, si la obrera da a luz antes del descanso prenatal, o durante éste, tiene derecho a extender el descanso postnatal por un período de tiempo igual al que dejó de disfrutar del descanso prenatal. En otras palabras, aunque el descanso postnatal de ordinario dura cuatro (4) semanas, puede extenderse a un máximo de siete (7) semanas a opción de la obrera embarazada si ello ha sido médicamente autorizado; y extenderse hasta un máximo de ocho (8) semanas si la obrera embarazada da a luz antes de comenzar a disfrutar del descanso prenatal.

La sección 2 de la Ley Núm. 3 provee, además, para que el patrono otorgue una **extensión especial parcial** de la licencia por maternidad después del alumbramiento. Durante el período adicional en cuestión, la madre obrera no tiene derecho a compensación mientras esté ausente del trabajo, **pero sí tiene derecho a que se le reserve el empleo**. Esta extensión de la licencia es por un período de hasta doce (12) semanas adicionales, y se otorga si se satisfacen **dos condiciones**. La primera es que la madre obrera haya sufrido alguna **complicación postnatal** tan seria que le impida trabajar aún después de haber expirado el período de descanso postnatal descrito en el párrafo anterior. Para que esta primera condición se satisfaga, es

necesario que la complicación referida sea **producida directamente por el alumbramiento**. Ello no sólo es cónsono con la naturaleza y propósitos de esta legislación, que persigue proteger a las obreras **en relación a su embarazo y alumbramiento**, sino que, además, surge asimismo de modo claro del propio historial legislativo de la disposición en cuestión.[5]

La segunda condición es que la madre obrera le presente al patrono **una certificación médica** acreditativa de la complicación postnatal aludida **antes de expirar el referido período de descanso postnatal**. La certificación médica en cuestión es el medio que tiene el patrono de enterarse de que la madre obrera continuará ausente del trabajo por una razón legítima. Le permite al patrono tomar oportunamente las medidas necesarias para que

_____

[5] La disposición de la Ley de Protección de Madres Obreras que amplía el descanso postnatal cuando sobreviene alguna complicación de salud después del alumbramiento existía desde el 13 de marzo de 1942, cuando la Ley fue aprobada originalmente. Entonces el descanso postnatal se ampliaba sólo hasta **cuatro (4) semanas adicionales**. En dicha Ley, se disponía claramente que dicha ampliación del término
Continuación nota al calce #5...

del descanso aludido se efectuaría de sobrevenir **"alguna enfermedad producida directamente por el alumbramiento"**. Véase, Leyes de Puerto Rico, 1942, pág. 287.

La disposición aludida se mantuvo vigente hasta el 19 de junio de 1969, cuando el término del descanso adicional por enfermedad sobrevenida por razón del embarazo se amplió hasta **doce (12) semanas adicionales**. En esa enmienda se simplificó el lenguaje de la disposición para decir que la ampliación del descanso en cuestión se efectuaría "si a la obrera le sobreviene alguna complicación _postpartum_". Véase Leyes de Puerto Rico, 1969, pág. 75. No obstante, el cambio en el lenguaje no cambió el propósito legislativo, de que se tratase de una **"enfermedad producida directamente por el alumbramiento"**, según surge del Informe al Senado de la Comisión de Trabajo del 1 de abril de 1969. Véase, Diario de Sesiones de la Asamblea Legislativa, Sesión Ordinaria, Vol. 23, Parte III, págs. 1401-1403 (1969).

la ausencia de la madre obrera no afecte la buena marcha de su empresa o negocio.

Es menester señalar que la Ley Núm. 3 dispone sanciones civiles **distintas** con respecto a los tres derechos esenciales que dicha Ley establece. Cuando el patrono despide a la obrera por razón del embarazo, o cuando se rehúsa restituirla en su trabajo luego del alumbramiento, la Ley Núm. 3 dispone no sólo que la obrera ha de ser repuesta en su trabajo sino, además, que se indemnizarán los daños que la obrera haya sufrido por el despido o por la negativa de restituirla mediante el pago de **una suma igual al doble** de dichos daños. Cuando de cualquier otra forma que no sea el despido, o el negarse a restituirla luego del alumbramiento, se discrimina contra la obrera embarazada por razón de la merma en su producción ocasionada por su estado grávido, la Ley Núm. 3 dispone que se le indemnizarán los daños que la obrera haya sufrido por tal discrimen mediante el pago de **una suma igual al doble** de dichos daños. Finalmente, cuando se le niegue a la madre obrera el descanso a que tiene derecho, referido antes, el patrono está obligado a conceder el **período de descanso a que la obrera tuviere derecho** o a **pagarle a la madre obrera el sueldo o compensación que corresponda a tal período de descanso**. Véase 29 L.P.R.A. secciones 469 y 472. La Ley Núm. 3 no establece con relación al incumplimiento patronal del período de descanso la penalidad de **doble daños** que fija con respecto a las otras protecciones dispuestas por esa legislación para las madres obreras. Se trata de "derechos separados que operan en distintas situaciones y con distinto resultado."

<u>Schneider v. Tropical Gas Company, Inc.</u>, 95 D.P.R. 626, 632 (1967).

Para concluir esta reseña de la normativa aplicable al caso de autos, es menester aludir brevemente a la Ley de Beneficios por Incapacidad Temporal, Ley Núm. 139 de 26 de junio de 1968, según enmendada, 11 L.P.R.A. sec. 201 <u>et seq</u>, mejor conocida como SINOT.

Como se sabe, la legislación sobre SINOT establece un seguro para cubrir el riesgo por incapacidad no ocupacional. Provee determinados beneficios monetarios para atenuar la pérdida de salarios cuando un obrero no puede desempeñar los deberes de su empleo por padecer de una inhabilidad para ello causada por una lesión o enfermedad que no esté relacionada con el empleo. 11 L.P.R.A. 202(g).

Al amparo de SINOT también se establece una **reserva de empleo** para el obrero incapacitado que cualifique. El patrono viene obligado a reservar el empleo que desempeñe el trabajador al momento de comenzar la incapacidad, y reinstalarlo en el mismo, si se cumplen las siguientes tres condiciones: (1) que el trabajador le requiera al patrono que lo reponga en su empleo, dentro del término de quince (15) días desde que fuere dado de alta y de un (1) año desde la fecha en que comenzó la incapacidad; (2) que el trabajador esté mental y físicamente capacitado para ocupar dicho empleo en el momento en que solicite su reposición al patrono; (3) que dicho empleo subsista al momento en que el trabajador solicite su reposición. 11 L.P.R.A. sec. 203(Q). Con respecto a estas condiciones, es menester resaltar que ya antes

hemos enfatizado que para que el trabajador incapacitado temporeramente tenga derecho al amparo de SINOT a ser reinstalado a su antiguo empleo, es necesario que éste haya requerido tal reinstalación dentro del término fijado por ley. Gilda Rojas v. Méndez, 115 D.P.R. 50 (1984).

La ley referida dispone además que si el patrono no repone al trabajador en su empleo cuando éste cualifica para ello, el trabajador podrá reclamar judicialmente su reinstalación, y tendrá derecho a recibir los salarios dejados de devengar y la indemnización de los daños y perjuicios que la negativa a reponer del patrono le haya causado. **Esta legislación no dispone la penalidad de paga doble**. 11 L.P.R.A. sec. 203(Q).

Los beneficios de SINOT son parcialmente extensivos a las madres obreras. Es decir, a partir de la enmienda que sufrió la legislación referida el 26 de julio de 1979, el embarazo se incorporó a la definición de "incapacidad" de dicha legislación, y da lugar a los beneficios provistos por ésta si la incapacidad resultante luego del embarazo es de tal naturaleza que inhabilite a la madre obrera para trabajar totalmente. Torres González v. Depto. del Trabajo, 127 D.P.R. 931, 936-37 (1991). En el caso de las trabajadoras que están disfrutando de alguna compensación en virtud de la Ley de Protección de Madres Obreras, la compensación que ofrece SINOT es limitada, porque la ley de SINOT prohíbe la duplicidad de beneficios. Id. En estos casos de compensación simultánea, la madre obrera sólo tendrá derecho a recibir al amparo de SINOT la diferencia entre los beneficios

pagados bajo la Ley Núm. 3 y el setenta y cinco por ciento(75%) de su salario semanal. 11 L.P.R.A. sec. 203(d)(2).

A la luz de todo lo anterior, pasemos ahora a examinar las cuestiones presentes en el caso de autos.

III

**La situación durante el embarazo**

Tanto el foro de instancia, como el foro apelativo, determinaron en el caso de autos que el Hospital discriminó contra la trabajadora recurrida **mientras ella estaba embarazada**. Según estos foros, el discrimen consistió de tres conductas del Hospital contra Meléndez acontecidas durante el embarazo.

A los fines de evaluar precisamente las tres conductas en cuestión, conviene comenzar nuestro análisis con una definición de lo que la Ley Núm. 3 prohíbe sobre este particular. Nótese que no se trata aquí de una situación de **despido** por razón de embarazo, sobre la cual nos hemos expresado en varias ocasiones antes. Se trata más bien de la situación prevista en el segundo párrafo de la sección 4 de la Ley Núm. 3 que prohíbe que se discrimine en contra de una trabajadora por razón de la merma en su producción ocasionada por su estado de embarazo.

La Ley Núm. 3 no define concretamente en qué consiste el discrimen referido. No tiene una definición del concepto "discrimen" ni del concepto "merma en su producción". No obstante, tales omisiones no son de modo alguno insuperables. Nunca hemos definido específicamente qué significa jurídicamente el concepto "discrimen", pero en variadas circunstancias hemos hecho referencia a éste significando

comúnmente que existe "discrimen" cuando ocurre un **trato desigual injustificado**; es decir, cuando alguna persona sufre una desigualdad por prejuicio o por arbitrariedad, sin que exista un fundamento razonable para la falta de trato igual. Véase, Calo Morales v. Cartagena Calo, 129 D.P.R. 102 (1991); Berberena v. Echegoyen, 128 D.P.R. 864 (1991); Mercado Vega v. U.P.R., 128 D.P.R. 273 (1991); Almodóvar v. Méndez Román, 125 D.P.R. 218 (1990); De Paz Lask v. Aponte Roque, 124 D.P.R. (1989); McCrillis v. Aut. Navieras de P.R., 123 D.P.R. 113 (1989); Salas v. Municipio, 119 D.P.R. 625 (1987), Viuda de Miranda v. Srio. de Hacienda, 114 D.P.R. 11 (1983); Berríos Miranda v. Asociación de Empleados, 88 D.P.R. 809 (1963).

En la situación que aquí nos concierne, existe discrimen si la obrera embarazada ha sufrido de su patrono un trato desigual, con relación al que reciben otros empleados similares, sólo porque dicha obrera ha tenido un rendimiento laboral menor que el usual por razón del embarazo. Es decir, el patrono incurre en el discrimen prohibido si le niega a la obrera embarazada algún beneficio que disfrutan otros empleados suyos igualmente situados sólo porque ésta, debido a su condición grávida, ha tenido una productividad menor a la usual. Véase, Soc. de Gananciales v. Centro Gráfico, *supra*, pág. 961; y Rivera Aguila v. K-Mart de P.R., 123 D.P.R. 599, 609 (1989).

Con estos conceptos como puntos de referencia jurídicos, pasemos a examinar concretamente las tres conductas imputadas al Hospital que supuestamente fueron de naturaleza discriminatoria.

A -  <u>**Los relevos**</u>

Los foros <u>a quo</u> determinaron en primer lugar, que el Hospital incurrió en discrimen por el embarazo de Meléndez porque a raíz de las complicaciones médicas de ésta, le asignaron a ella realizar **relevos** de los turnos de trabajo.

Los hechos que constan en autos no sostienen la referida determinación judicial. Nótese, por un lado, que la tarea de realizar relevos era inherente al trabajo que Meléndez tenía. Todos los empleados del Hospital que prestaban servicios de terapia respiratoria tenían el deber de realizar relevos de ser ello necesario. Por esa razón, **ello fue siempre parte de las funciones de Meléndez en el Hospital**, independientemente del turno de trabajo que ésta tuviese. Meléndez estaba sujeta a realizar tales relevos desde que comenzó a trabajar allí. Ello continuó siendo parte de su responsabilidad laboral cuando se le asignó de modo fijo el turno de 3:00 p.m. a 11:00 p.m.; y aun cuando fue nombrada jefa del grupo de terapia respiratoria del turno de 3:00 p.m. a 11:00 p.m. Tenía ese deber antes de estar embarazada, al igual que durante los primeros meses del embarazo cuando aún no había sufrido complicaciones médicas. Luego de que comenzaron las complicaciones referidas, a Meléndez se le continuaron asignando relevos <u>**igual que se hacía antes y de la misma forma en que se le asignaban a otros terapistas**</u>; es decir, se le asignaba el turno de relevo a un terapista un día y al próximo día se le asignaba a otro terapista y así sucesivamente. **A Meléndez se le mantuvo ordinariamente en este sistema de relevos hasta que se tuvo conocimiento de la orden médica de un**

**doctor del propio Hospital prohibiendo que se le asignaran relevos a Meléndez.** Hasta entonces ningún médico la había incapacitado para hacer el trabajo de relevo y la propia recurrida admitió en uno de los documentos que obran en autos que durante el tiempo en que experimentó complicaciones por el embarazo ella podía y deseaba trabajar. No podía concluirse, pues, que la asignación de relevos a Meléndez después que comenzaron las complicaciones referidas constituyó un acto discriminatorio. **<u>No hubo trato desigual alguno</u>**.

Por otro lado, es menester tener en cuenta que si bien a Meléndez se le continuaron asignando relevos como era acostumbrado aún después que su embarazo se complicó, como cuestión de hecho **<u>ella no llegó a realizar ninguno de tales relevos a partir del 2 de octubre de 1995, cuando se recomendó por personal médico del propio Hospital que no debía realizar turnos dobles</u>**. Los turnos de relevos en el Hospital se asignaban de ordinario **<u>por adelantado cada quince días</u>**. Por ello, Meléndez tenía relevos ya asignados por algunos pocos días posteriores al 2 de octubre de 1995 cuando se emitió a esa fecha la referida recomendación médica. Sin embargo, Meléndez no tuvo que realizar relevo alguno a partir del 2 de octubre de 1995 toda vez que las personas que tenían asignados tales turnos de ordinario, asistieron a ellos por lo que no hubo necesidad de sustituirlos.

A la luz de todo lo anterior, no puede concluirse que Meléndez sufrió discrimen en relación a los **<u>relevos</u>** en su empleo por razón de su embarazo.

**B – <u>El cambio en el turno</u>**

Los foros *a quo* también determinaron que Meléndez sufrió un trato discriminatorio por parte del Hospital durante su embarazo porque se le cambió el turno   fijo que se le había asignado para su jornada de trabajo. Como se indicó antes, cuando Meléndez comenzó a trabajar en el Hospital, ella tenía asignados turnos rotativos de trabajo, al igual que todos los otros terapistas respiratorios. Para el tiempo en que Meléndez quedó embarazada, en abril de 1995, ella tenía asignado un turno fijo de trabajo de 3:00 p.m. a 11:00 p.m. Seis meses más tarde, **a partir del 9 de octubre de 1995**, su supervisora inmediata la volvió a colocar en turnos rotativos; es decir le cambió el turno de trabajo, del fijo que tenía a uno rotativo. Meléndez entonces tuvo turnos de 7:00 a.m. a 3:00 p.m. unos días; turnos de 3:00 p.m. a 11:00 p.m. otros días; y turnos de 11:00 p.m. a 7:00 a.m. en aun otros días. Esta nueva situación prevaleció sólo **por unas pocas semanas** ya que Meléndez dejó de trabajar por razones médicas el **6 de noviembre de 1995**.

El foro de instancia determinó que el breve cambio en los turnos de la recurrida constituyó un acto de discrimen. Apoyó tal determinación en que la supervisora inmediata de Meléndez, al ser notificada de que a esta terapista no se le podían asignar turnos dobles —un turno de relevo después de completar su turno regular— comentó que no volvería a reclutar a mujeres jóvenes y solteras porque se enamoraban y luego venían con problemas de embarazo. Para el foro de instancia, confirmado por el foro apelativo, el breve cambio referido constituyó un acto discriminatorio de maltrato porque a la recurrida, que residía

en Ponce, le era **inconveniente** atender los turnos que comenzaban a las 7:00 a.m. o a las 11:00 p.m. La determinación de discrimen se basó en la apreciación de los foros *a quo* de que la supervisora de Meléndez no realizó los ajustes que estaban a su alcance para acomodarla, sino que más bien actuó con desconsideración a su estado de salud. Conforme a dichos foros, la supervisora de Meléndez no podía cambiarle a ésta el turno de trabajo de 3:00 p.m. a 11:00 p.m. porque ese turno era el que Meléndez prefería y el que le era más conveniente. No importó para las referidas determinaciones judiciales que el cambio se hubiera hecho **por una necesidad del empleo**, en vista de las ausencias y tardanzas de Meléndez. Es evidente que al poner a Meléndez en turnos rotativos, el impacto adverso de sus ausencias y tardanzas sobre los servicios de terapia respiratoria que prestaba el Hospital se minimizaban, al esparcirse o distribuirse entre los tres turnos de trabajo, en lugar de ocurrir siempre en uno solo de esos turnos. Tampoco importó que el turno fijo que se le había concedido antes a Meléndez hubiese sido un privilegio especial que el Hospital le había otorgado, ya que ella no tenía un derecho como tal sobre el turno particular en cuestión. Nótese que todos los terapistas respiratorios del Hospital trabajaban turnos rotativos de ordinario, y que era parte de las condiciones de empleo de todos los terapistas en general que debían trabajar en los turnos que se le asignaran.

El cambio en cuestión no constituyó un acto de discrimen. Dicho cambio no representó un **trato desigual** porque la asignación de nuevo de turnos rotativos que ella había tenido antes,

**constituía de ordinario parte integral de la jornada de trabajo del cargo que ella ocupaba, que se le asignaba también regularmente a los otros terapistas respiratorios del Hospital.** Más aun, el cambio estuvo **justificado** por necesidades del servicio que presta el Hospital. En efecto, el cambio fue realmente sólo un ajuste realizado por la supervisora inmediata para acomodar de la forma menos disruptiva posible las continuadas ausencias y tardanzas de Meléndez que la supervisora vislumbraba. No hubo, pues, un trato desigual injustificado. El hecho de que la referida reasignación de turnos rotativos le fuera menos conveniente a Meléndez que la que tuvo por un tiempo antes, no puede constituir un acto discriminatorio porque la Ley Núm. 3 que nos concierne no garantiza de modo alguno que la obrera embarazada sólo tenga que trabajar en el horario que más le convenga.

Existe otro aspecto del asunto en cuestión que debemos traer a colación aquí. La indemnización decretada por el foro de instancia en el caso de autos, referida antes, fue impuesta **globalmente** por los "sufrimientos físicos y angustias mentales" de Meléndez durante el embarazo, luego de dar a luz, y como consecuencia del supuesto despido ilegal. El tribunal no desglosó cuánto correspondía a cada una de las tres instancias aludidas, ni identificó cuáles fueron los daños específicos que supuestamente sufrió Meléndez en cada una de esas tres instancias. Esta apreciación conjunta de los daños de Meléndez en tres instancias distintas no permite precisar los daños que

corresponden concretamente al supuesto discrimen durante el embarazo.

Sin embargo, en la parte de la sentencia del foro de instancia en la cual se formulan las llamadas determinaciones de hechos, dicho foro expresamente indicó[6] que la "constante falta de consideración" de la supervisora hacia el estado de salud de Meléndez le ocasionó "daños físicos y emocionales" a ésta entre los cuales identificó "severas lesiones a su estado de ánimo", "contracciones prematuras", "aprehensión", e "hipertensión". Estas determinaciones son sorprendentes e insostenibles en vista de que el propio tribunal en la misma sentencia reconoció expresamente que Meléndez tenía un historial médico adverso al embarazo por una condición de hipertensión asintomática que había causado que tres bebes anteriores murieran asfixiados en su vientre por razón de los aumentos súbitos y dramáticos que Meléndez sufría en su presión arterial.[7] También reconoció el foro de instancia que después de varios meses de embarazo normal, Meléndez comenzó a experimentar las complicaciones que había sufrido en otros embarazos, **"tales como hipertensión, ansiedad, anemia, nauseas y vómitos", producidas directamente por su estado de embarazo"**, por lo que presentaba un cuadro de alto riesgo, que tenía que ser "medicada diariamente para evitar las contracciones prematuras", todo lo cual dio lugar a que uno de sus médicos la hospitalizara por su condición y la refiriera a SINOT, y a que otro de sus médicos adelantara el parto

---

[6] Determinaciones de hecho números 37, 38 y 52.
[7] Determinaciones de hecho números 17 y 18; 25 y 26.

por cesárea.[8] Cuando menos, unas determinaciones de hechos son contradichas por otras. Más aun, de un estudio cuidadoso e integral de todo el expediente que obra en autos, es evidente que las complicaciones que sufrió la recurrida durante el embarazo se debieron esencialmente a la referida condición seria de hipertensión asintomática que ella padecía y no a la alegada conducta "desconsiderada" de su supervisora inmediata. Lo anterior constituye otra razón más por lo cual no puede concluirse aquí que proceden las graves sanciones civiles que fija la Ley Núm. 3 en casos de discrimen durante el embarazo de la mujer obrera. Para ello la Ley Núm. 3 requiere no sólo que haya existido un trato discriminatorio de parte del patrono hacia la obrera embarazada –que no lo hubo aquí– sino, además, que tal conducta **haya causado daños**, lo que tampoco ocurrió aquí.

### C – <u>El cómputo de las ausencias y tardanzas</u>

Los foros *a quo* determinaron también que hubo discrimen del Hospital hacia Meléndez durante el embarazo en relación a las ausencias y tardanzas de ésta en su empleo motivadas por las complicaciones de su embarazo. El discrimen supuestamente consistió en que la supervisora se negó a cargarle tales ausencias y tardanzas de Meléndez a su licencia de enfermedad, imputándoselas más bien a la licencia de vacaciones de Meléndez. Resulta, sin embargo, que la aludida acción de la supervisora no estuvo dirigida específica o exclusivamente hacia Meléndez. El propio foro de instancia determinó que dicha supervisora era

---

[8] Determinaciones de hecho números 27, 28, 59, 60 y 65.

una persona autoritaria, con muy poca paciencia o tolerancia, de temperamento impasible que provocaba incidentes desagradables con **todos** sus supervisados. Determinó, además, que dicha supervisora le descontaba **a todos** los terapistas sus ausencias y tardanzas de sus licencias de vacaciones y no de las de enfermedad.[9] Por ende, no hubo **trato desigual** alguno con respecto a este asunto. La supervisora admitidamente trataba a todos los terapistas por igual en cuanto a este particular. No hubo, pues, discrimen contra Meléndez.

### D – Otras consideraciones

Recapitulando, ninguna de las tres actuaciones imputadas al Hospital en el caso de autos durante el embarazo de Meléndez constituyeron actos de discrimen. No hubo **trato desigual** en ninguno de ellos.[10]

---

[9] Determinaciones de hecho números 11, 12, 13 y 14.

[10] Debe indicarse asimismo que la falta de fundamentación objetiva para sostener el dictamen de discrimen durante el embarazo se refleja también en el continuado uso por el foro de instancia de adjetivaciones desmesuradas en su sentencia al referirse a la conducta de la supervisora como "inhumana e incompasible", "caprichosamente abusiva y arbitraria", provocada por "animosidad", "mezquina", y "hostil", **que son similares a unas usadas precisamente por la representación legal de la recurrida en sus escritos ante nos**, y que no son consistentes con los hechos específicos y concretos sobre la conducta de la supervisora que surgen del expediente. La referida falta de fundamentación objetiva se refleja también en la insistencia de dicho foro en su sentencia en que a Meléndez se le continuaron asignando turnos de relevo (turnos dobles) aun después de que el 2 de octubre de 1995 éstos fueran prohibidos por un médico del Hospital, sin hacer referencia a la vez al hecho **estipulado por las partes** de que Meléndez no realizó **ninguno de tales relevos**, que se asignaban **quincenalmente por adelantado**. El tribunal, pues, no presentó el cuadro completo de los hechos en su sentencia, omitiendo hechos muy pertinentes a la cuestión de si en efecto la recurrida sufrió actos de discrimen.

**Más aun, existen otras consideraciones no mencionadas antes que también apoyan nuestra conclusión**. En primer lugar, nótese que la recurrida no fue privada de su empleo durante su embarazo, ni se le redujo su salario durante ese tiempo. Lo que efecto ocurrió fue que **se le aumentó significativamente su compensación en dos ocasiones aun después de comenzar sus complicaciones con el embarazo**. Asimismo, las tareas en sí que desempeñaba la recurrida como terapista respiratoria no sólo no fueron alteradas de ningún modo durante el tiempo en cuestión, sino que se toleró que Meléndez las realizara incompletamente, con tardanzas y ausencias. La recurrida también recibió un trato especial de parte del Hospital debido a su condición de embarazo en vista de que en algunas ocasiones que Meléndez sintió complicaciones por dicha condición, pudo acudir a dicho Hospital, donde recibió atención médica inmediatamente, y donde incluso fue hospitalizada en dos ocasiones.

También es menester señalar que Meléndez en ninguna ocasión acudió al jefe patronal para objetar el proceder de su supervisora inmediata hacia ella. Por el contrario, según surge de las propias determinaciones del foro de instancia, Meléndez más bien aceptó tal proceder, según surge de las determinaciones de hecho números 23, 24 y 37 del propio tribunal de instancia. Pudo haber recurrido ante el director médico del Departamento

---

Asimismo el foro de instancia erró al permitir el objetado testimonio de Hernández con respecto al supuesto discrimen de la supervisora contra Meléndez. Hernández no trabajaba para el Hospital a partir de mayo de 1995 y por ende no tenía conocimiento personal sobre hechos ocurridos en el Hospital posterior a esa fecha. La desvinculación de Hernández con el Hospital ocurrió

de Terapia Respiratoria del Hospital, quien fue el funcionario patronal que le había otorgado el turno de trabajo fijo inicialmente, y quien era el jefe de la propia supervisora inmediata de Meléndez, **pero no lo hizo**. A los fines de concluir los turnos dobles, Meléndez sí acudió a un doctor del Hospital, que entonces los prohibió. Pero no hizo igual con respecto a los otros asuntos en cuestión, a pesar de que tenía a su alcance ese medio para cuestionar las decisiones de su supervisora inmediata, si es que realmente entendía que dichas decisiones no eran correctas.

A la luz de estas otras consideraciones, también resulta evidente la improcedencia de responsabilizar al **Hospital en sí** por un supuesto discrimen de una supervisora contra Meléndez durante su embarazo. Si algo surge del expediente visto de modo integral es que, en balance, el Hospital como entidad patronal, no sólo no incurrió en algún trato desigual injustificado sino que, por el contrario, le ofreció beneficios adicionales a Meléndez durante su embarazo.

Erró, pues, el foro apelativo al confirmar esta parte del dictamen del Tribunal de Primera Instancia.

IV

**El despido por embarazo**

En el caso de autos, el foro de instancia también determinó al amparo de la Ley Núm. 3 que la recurrida fue **despedida discriminatoriamente por razón de su embarazo**, y el foro

---

**antes** de que Meléndez comenzara a experimentar complicaciones

apelativo confirmó este dictamen. Según el foro de instancia, el supuesto despido discriminatorio ocurrió  mientras Meléndez estaba en licencia de incapacidad al amparo de SINOT. Resolvió dicho foro que la recurrida estaba válidamente ausente de su empleo debido a una complicación postnatal y que en tales circunstancias, según la Ley, el Hospital venía obligado como patrono a reservarle su empleo, por lo que la recurrida no tenía que solicitar su reinstalación.

Conforme a los hechos relatados antes, Meléndez había disfrutado ya de **ocho** semanas de descanso **postnatal**, ausente de su trabajo, cuando el 29 de marzo de 1996 solicitó del Hospital un período de descanso adicional por razón de la condición de "carpal tunnel syndrome" que sufría. El 3 de abril de 1996 el Hospital le requirió a Meléndez que regresara a su trabajo o que justificase su ausencia. Como Meléndez continuó ausente de su trabajo, el Hospital la despidió el 23 de abril de 1996, por abandono de su empleo. Debemos decidir si tal actuación constituyó un despido discriminatorio por embarazo al amparo de la Ley de Protección de Madres Obreras, como los foros *a quo* resolvieron que lo era.

Nótese, en primer lugar, que Meléndez continuó su ausencia del trabajo **aunque ya había terminado** su licencia ordinaria postnatal. La continuada ausencia fue ocasionada por una condición médica **que no fue causada por el embarazo**. El propio doctor de Meléndez, que emitió el certificado correspondiente, hizo constar que la condición referida que persistía aún ocho

en su embarazo.

semanas después del alumbramiento, **no estaba relacionada con el embarazo**.

En efecto, la condición conocida como "carpal tunnel syndrome" se refiere al desorden nervioso que resulta de la compresión o apresamiento del nervio medial de la muñeca por el ligamento carpal de ésta. Se trata de una condición que puede tener diferentes orígenes o causas. Así pues, se ha relacionado en estudios médicos con personas que han sufrido fracturas de la muñeca, o que padecen de alcoholismo, de diabetes, de obesidad, de artritis reumatoide o de padecimientos renales crónicos. También se relaciona dicha condición con el uso intenso y continuo de la mano o la muñeca. Contemporáneamente se asocia el "carpal tunnel syndrome" con el uso de las computadoras. Como bien se señala en el Attorneys' Textbook of Medicine (3ra. Ed., sección 3B.oo):

> **Carpal tunnel syndrome is the most common of the cumulative trauma disorders that are now being recognized in many jobs and activities requiring repetitive hand motion. The tremendous increase in the use of computers has been linked to an almost epidemic rise in reports of CTS, a condition rarely diagnosed fifty years ago.**

La literatura científica reconoce que **"some women experience transient carpal tunnel syndrome during pregnancy due to peripheral edema..."** P.R. Martin y J. H. Clay, True Carpal Tunnel Syndrome, en Mc Henry Neuro Diagnostics (Mc Henry, Illinois, 1996). En tales casos, la condición **usualmente desaparece después del alumbramiento**, pero puede persistir **si la condición existía antes del embarazo**. W. Hagberg, Carpal

Tunnel Syndrome During Pregnancy.[11] En el Attorney Medical Advisor, Capítulo 67.4 se resume lo anterior en los siguientes términos:

> "Pregnancy is a prime cause of fluid retention and the reason that many women experience Carpal Tunnel Syndrome for the first time during pregnancy. **When associated with pregnancy, the condition will resolve with the conclusion of the pregnancy**." (Énfasis suplido.)

En el caso de autos, no existe controversia en cuanto a que la referida condición de Meléndez no estaba relacionada con el embarazo, **según declaró su propio médico**. Por ende, Meléndez no cumplía con el primer requisito necesario para que le cobijase la disposición de la Ley Núm. 3 que amplía el descanso postnatal por un período de hasta doce (12) semanas adicionales una vez ha terminado la licencia ordinaria por maternidad. Como se señaló antes, ese primer requisito es que la madre obrera haya experimentado alguna complicación de salud **"producida directamente por el alumbramiento"**. Tal no fue el caso aquí, por las razones ya señaladas.[12]

---

[11] Véase, http:pregnancytoday.com.

[12] El Hospital planteó ante nos que Meléndez no había satisfecho una segunda condición que era necesaria para ser acreedora del referido período de descanso postnatal adicional. Según el Hospital Meléndez debió presentarle una certificación médica sobre su condición **antes de expirar el período ordinario de descanso postnatal**. Conforme a lo estipulado por las partes, el periodo de descanso postnatal aquí duró hasta el 28 de marzo de 1996, pero no fue hasta el 29 de marzo de ese año que Meléndez presentó el certificado médico correspondiente a su patrono.

Continuación nota al calce #12...

El Hospital alegó ante nos que cuando Meléndez dio a luz, ya había disfrutado de una semana de descanso pre-natal, por lo

Es evidente, pues, que Meléndez no estaba protegida por la disposición de la Ley Núm. 3 que amplía el período de descanso postnatal. No estuvo presente aquí una condición indispensable para que una madre obrera pueda disfrutar de la extensión del período de licencia postnatal que provee la Ley Núm. 3. Por ende, concluido el período ordinario del descanso postnatal, Meléndez no tenía protección alguna al amparo de dicha Ley. Es decir, su continuada ausencia del empleo no estaba justificada al amparo de la Ley de Protección de Madres Obreras, por lo que no podía concluirse que su despido fue uno discriminatorio por razón de embarazo. Erraron el foro de instancia y el foro apelativo al resolver que dicho despido constituyó un acto de discrimen prohibido por la Ley referida.

V

**El despido al amparo de SINOT**

Lo resuelto en el párrafo anterior, sin embargo, no concluye aún con los asuntos del caso de autos. Para el 29 de marzo de

---

que sólo tenía siete (7) semanas de descanso postnatal, que vencían el 22 de marzo de 1996. La recurrida, en cambio, adujo que al momento de dar a luz estaba en licencia por incapacidad, por lo que tenía derecho a una licencia de ocho (8) semanas que terminaba el 28 de marzo de 1996. En efecto, tal fue la estipulación de las partes que obra en autos. Por disposición expresa de la Ley Núm. 3, la solicitud para extender el descanso postnatal debía presentarse **antes** de que venciera la licencia ordinaria; es decir, **antes** del 28 de marzo de 1996, lo que no se hizo.

En vista de que la solicitud referida se presentó sólo un día después que venciera el citado término, no nos expresamos ahora sobre el efecto de ello. No es necesario hacerlo porque Meléndez de cualquier forma no satisfizo la otra condición que sí es esencial de que la complicación posterior al parto sea una consecuencia de éste.

1996 Meléndez no tenía ya derecho a que se le reservara su empleo al amparo de la Ley de Protección de Madres Obreras, pero sí lo tenía al amparo de SINOT.

Según se ha indicado antes, el 29 de marzo de 1996 Meléndez se acogió a los beneficios de la ley que provee medidas para los trabajadores que sufren de incapacidad temporal no ocupacional. Dicha legislación obliga al patrono a reservar el empleo que desempeñe el trabajador al momento de comenzar la incapacidad. Meléndez se acogió a los beneficios referidos por la condición de "carpal tunnel syndrome" que sufría y lo hizo precisamente porque los beneficios a que tenía derecho al amparo de la Ley de Protección de Madres Obreras habían terminado. No cabe duda, pues, que a partir del 29 de marzo de 1996, el Hospital tenía que reservarle a Meléndez su puesto de terapista de respiración por espacio de un año, si el puesto subsistía durante ese tiempo. El Hospital no podía actuar como lo hizo el 23 de abril de 1996, cuando despidió a Meléndez por un supuesto abandono del trabajo. Tal despido fue ilícito, por contravenir las disposiciones de SINOT.

VI

En resumen, no procedía en el caso de autos la imposición de alguna indemnización, con penalidad o sin ella, por daños ocasionados por un supuesto discrimen por razón de embarazo al amparo de la Ley de Protección de Madres Obreras. Sí procede la

reinstalación de Meléndez en su empleo,[13] con el pago de los salarios correspondientes dejados de recibir a partir de la fecha en que la recurrida estuviese capacitada para ocupar su antiguo empleo, si ello ocurrió dentro del año siguiente al 29 de marzo de 1996. A esta cantidad se le restará cualquier otro ingreso por trabajo realizado por Meléndez, que ésta haya recibido mientras estuvo fuera de su empleo en el Hospital. Véase, Hernández v. Mun. de Aguadilla, res. el 5 de junio de 2001, 154 D.P.R. ___, 2001 TSPR 78, 2001 JTS 81. También procede que se indemnice de modo ordinario los daños y perjuicios que el Hospital le haya podido causar a Meléndez por el despido ilícito referido antes. 11 L.P.R.A. sec. 203 (q).

Por los fundamentos expuestos, se dictará sentencia para revocar la del foro apelativo en el caso de autos de 27 de junio de 2000 y para dejar sin efecto la del foro de instancia de 30 de agosto de 1999. Se devolverá el caso a este foro para que luego de recibir la prueba correspondiente dicte una nueva sentencia a favor de Meléndez conforme a lo dictaminado aquí.

---

[13] Según señalamos antes, un trabajador que se encuentra ausente de su empleo por incapacidad temporal no ocupacional debe ser reinstalado por su patrono a dicho empleo cuando el empleado lo solicita dentro de los quince (15) días de haber sido dado de alta. **Tal solicitud no ocurrió aquí.** No obstante, es evidente que tal solicitud de parte de Meléndez hubiese sido fútil en este caso, y por ende, innecesaria. La recurrida se comunicó con el Hospital cuando se le requirió que regresara a trabajar, para reiterarle que se encontraba incapacitada por el "carpal tunnel syndrome" y acogida a SINOT. En dos ocasiones, pues, Meléndez le notificó al Hospital que su ausencia del trabajo se debía a una incapacidad temporera no ocupacional. Aun así, el Hospital la despidió, haciendo caso omiso de su obligación al amparo de SINOT de reservarle el empleo a Meléndez. En esta circunstancias estuvo justificado que la recurrida no insistiese otra vez para solicitar ser reinstalada en su empleo al terminar su incapacidad temporal.

JAIME B. FUSTER BERLINGERI
JUEZ ASOCIADO


EN EL TRIBUNAL SUPREMO DE PUERTO RICO


Vivian Meléndez Rivera

    Demandante-Recurrida


      vs.                    CC-2000-673      Certiorari


Asociación Hospital del
Maestro

    Demandante-Peticionaria


**SENTENCIA**


San Juan, Puerto Rico, a 10 de mayo de 2002.


Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte de la presente, se dicta sentencia revocando la del Tribunal de Circuito de Apelaciones, Circuito Regional de San Juan, en el caso de autos de 27 de junio de 2000 y para dejar sin efecto la del Tribunal de Primera Instancia, Sala de San Juan, de 30 de agosto de 1999.

Se devuelve el caso a este foro para que luego de recibir la prueba correspondiente dicte una nueva sentencia a favor de Meléndez conforme a lo dictaminado aquí.

Lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Hernández Denton disiente con opinión escrita, a la cual

se une el Juez Asociado señor Corrada del Río. El Juez
Asociado señor Rivera Pérez no intervino.


                              Patricia Otón Olivieri
                          Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Vivian Meléndez Rivera

    Demandante-Recurrida

       vs.                       CC-2000-673    Certiorari

Asociación Hospital del
Maestro

    Demandada-Peticionaria

Opinión Disidente emitida por el Juez Asociado señor Hernández Denton a la cual se une el Juez Asociado señor Corrada del Río

San Juan, Puerto Rico, a 10 de mayo de 2002.

El discrimen por razón de embarazo en el trabajo es probablemente el más patente entre todas las conductas discriminatorias contra la mujer trabajadora, pues en éste los daños se multiplican ya que sus efectos económicos y sociales trascienden más allá de la mujer *per se*. Constituye, además, "otro motivo más por [el] cual crecientemente muchas de nuestra[s] mujeres jóvenes se sienten ambivalentes en torno a la maternidad, que cada vez más se percibe... como que ofrece lo mejor y lo peor de dos mundos".[14]

Es

**en estos casos, de discrimen por razón de embarazo, en los cuales**

**tenemos que demostrar nuestra sensibilidad ante las injusticias que**

---

[14] Véase Opinión Disidente del Juez Asociado señor Fuster Berlingeri en <u>López y Otros v. Porrata Doria y otros</u>, CC-2000-558, res. el 4 de abril de 2002, 2002 T.S.P.R. 39.

**se cometen contra "las madres abnegadas que con tanto sacrificio laboran" para sustentar a su familia. Id.**

Sin embargo, la Opinión del Tribunal parece no haber estimado las consideraciones anteriores al concluir que en este caso, no hubo discrimen en contra de una trabajadora por razón de la merma en su producción ocasionada por su estado de embarazo. Por lo tanto, disentimos. A nuestro entender, quedó evidenciado que existe una relación directa entre el menor rendimiento de la demandante, como consecuencia de sus complicaciones de salud a causa de su embarazo, y el cambio en sus condiciones de trabajo. Por consiguiente, se constituyó un discrimen por razón de embarazo al amparo de la Ley para la Protección de Madres Obreras.[15] Veamos.

I

A continuación expondremos los hechos pertinentes para nuestro análisis, según los estimó probados el Tribunal de Primera Instancia después de evaluar la prueba documental y testifical presentada por ambas partes. Debemos aclarar, de entrada, que nos limitaremos a discutir los pronuncia-mientos del acápite A en la parte III de la Opinión del Tribunal.

La Sra. Vivian Meléndez Rivera (en adelante la "señora Meléndez") comenzó a trabajar en el Hospital del Maestro (en adelante "el Hospital") como terapeuta respiratorio en marzo de 1994. Sus cualidades profesionales lograron que, a pocos meses de comenzar a laborar en el Hospital, fuera asignada a un turno regular de trabajo permanente de 3:00 de la tarde a 11:00 de la noche. Esto le permitía viajar desde su residencia en Ponce a su trabajo en San Juan. En 1995, La señora Meléndez fue nombrada jefa del grupo de terapeutas para dicho turno, junto a la terapeuta Ivelisse Matos, quien también estaba

asignada al turno regular de 3:00 de la tarde a 11:00 de la noche. Como parte de sus obligaciones en el trabajo, la señora Meléndez tenía que hacer turnos dobles o relevos, si la persona asignada no se presentaba a cubrir su horario.

Así las cosas, la señora Meléndez quedó embarazada del Sr. Alberto Hernández, compañero de trabajo del Hospital. Este era su quinto embarazo, habiendo perdido tres de ellos anteriormente a causa de una condición de hipertensión asintomático, "que causaba que sus bebés murieran asfixiados en su vientre por razón de súbitos y dramáticos aumentos de su presión arterial". Esta situación de salud causada <u>directamente</u> por su estado de embarazo, provocó que la señora Meléndez se tuviera que ausentar de su empleo periódicamente para recibir tratamiento médico.

A pesar de que la señora Meléndez justificaba sus ausencias por razones de salud y presentaba certificados médicos al respecto, la supervisora inmediata, la Sra. Norma Cruz (en adelante "la señora Cruz") le marcaba sus ausencias como asuntos personales. Como resultado de lo anterior, las ausencias eran descontadas de su licencia de vacaciones y no de enfermedad. Incluso, si llegaba minutos tarde por confrontar malestares físicos por su embarazo, la señora Cruz la recriminaba y amonestaba.

Asimismo, se evidenció ante el tribunal de instancia que, estando en su cuarto mes de embarazo, la señora Meléndez sufrió un ataque de ansiedad por el cual fue mantenida en observación durante una noche en el Hospital de Damas en Ponce. Este ataque se debió a que la señora Cruz le asignó atender a un paciente con varicelas, enfermedad altamente contagiosa que podría provocar la pérdida o serias deformaciones del feto.

---

[15] Ley Núm. 3 de 13 de marzo de 1942, 29 L.P.R.A. sec. 467 *et seq.*

El 2 de octubre de 1995, específicamente en su quinto mes de embarazo, el médico que atendía a la señora Meléndez le indicó que debido a las complicaciones de salud por su estado de embarazo no podía trabajar turnos dobles y a esos efectos le entregó un certificado médico. Al día siguiente, la señora Meléndez fue atendida en la Sala de Emergencia del Hospital del Maestro, en donde la mantuvieron en observación durante toda la noche por tener el pulso acelerado. El 4 de octubre de 1995, fue dada de alta con una orden médica de mantener descanso absoluto por un periodo de 48 horas. Inmediatamente después de salir de la Sala de Emergencia, la señora Meléndez se dirigió al área de Terapia Respiratoria para entregar los referidos certificados médicos; a saber, el que ordenaba descanso por 48 horas y el que disponía que ella no podía hacer turnos dobles.

Al recibir los certificados médicos, la señora Cruz se molestó y le gritó a la señora Meléndez que **"no reclutaría más mujeres jóvenes y solteras porque se enamoraban y luego venían con problemas de embarazo"**. Le indicó entonces que **"si no podía doblar turnos la pondría a rotar turnos"**; refiriéndose a que le cambiaría su horario regular permanente de 3:00 de la tarde a 11:00 de la noche a uno irregular que variaba diariamente según se asignara cada quince días.

Así, cuando la señora Meléndez se reincorporó a trabajar el lunes 9 de octubre de 1995, se encontró con el hecho de que todos sus turnos habían sido alterados. Además, tenía asignado el deber de relevar, o sea, doblar turnos, a pesar de la orden médica indicando lo contrario. **Valga señalar, que la otra terapeuta que tenía horario regular de 3:00 de la tarde a 11:00 de la noche se mantuvo fija en dicho turno.**

A pesar de que la señora Meléndez compartía turnos con otros terapeutas que estaban cualificados para relevar, la señora Cruz le asignó a ésta exclusivamente dicha responsabilidad. Esta situación se

prolongó por casi un mes. El 29 de octubre de 1995, la señora Meléndez fue recluida en el Hospital del Maestro por complicaciones con su embarazo, incidente que la llevó a acogerse a los beneficios de la Ley de Beneficio por Incapacidad Temporal, *supra*.

A la luz de estos hechos, el Tribunal de Primera Instancia determinó que el discrimen por razón de embarazo quedó establecido cuando el patrono "despojó" a la señora Meléndez de su turno regular de trabajo y le impuso trabajar turnos rotativos sin justa causa. Concluyó, además, que el patrono no rebatió la presunción de discrimen que dispone la Ley para la Protección de Madres Obreras, *supra*. Por lo tanto, ordenó los remedios procedentes en virtud de la Ley para la Protección de Madres Obreras, *supra*; la Ley Núm. 69 de 6 de julio de 1985[16] y la Ley Núm. 100 de 30 de junio de 1959.[17] Oportunamente, el Hospital acudió al Tribunal de Circuito de Apelaciones, el cual confirmó la decisión del tribunal de instancia. Inconforme, el Hospital acude ante nos.

## II.

### A.

Ante el cuadro fáctico anterior, este Tribunal concluye, entre otras cosas, que el cambiarle el turno a la señora Meléndez no constituyó discrimen por razón de embarazo porque (i) todos los terapeutas rotaban; (ii) el horario fijo era un "privilegio especial" y no un derecho; (iii) y que el cambio en el horario respondió a "una necesidad del empleo, en vista de las ausencias y tardanzas de Meléndez". La Opinión del Tribunal llega a estas determinaciones en franca indiferencia a la evidencia presentada ante el Tribunal de

---

[16] 29 L.P.R.A. sec. 1321 *et seq.*

[17] 29 L.P.R.A. sec. 146 *et seq.*

Primera Instancia y a la apreciación de credibilidad que hiciera éste tras la vista en su fondo y tres (3) años de trámite procesal. Primero, ante el tribunal de instancia se evidenció que existía por lo menos una terapeuta con el mismo horario regular que la señora Meléndez. Segundo, la señora Meléndez obtuvo el horario regular permanente al que fue asignada en retribución a su desempeño como buena empleada del Hospital, y no como un "privilegio especial". Tercero, el Hospital en ningún momento ha alegado que el cambio adverso en el horario de trabajo de la señora Meléndez respondió a una necesidad del empleo.

En fin, para la Opinión del Tribunal, las determinaciones de hecho que hiciera el tribunal de instancia, y que diera como probadas el Tribunal de Circuito de Apelaciones, no merecieron valor alguno. Esto, a pesar de que reiteradamente hemos resuelto que en ausencia de error, prejuicio o parcialidad, este Tribunal no intervendrá con las determinaciones de hechos, la apreciación de la prueba y las adjudicaciones de credibilidad efectuadas por el tribunal de instancia. Trinidad García v. Chade, res. el 18 de enero de 2001, 2001 T.S.P.R. 7; Pueblo v. Maisonave Rodríguez, 129 D.P.R. 49 (1991). Esta sabia norma busca evitar lo que ocurrió en este caso; a saber, que las determinaciones de los tribunales de primera instancia sean sustituidas por las apreciaciones infundadas del foro apelativo.

En este sentido, hemos sido consistentes y firmes al resolver que los foros recurridos están en mejor posición para evaluar la prueba desfilada, pues tienen la oportunidad de ver y oír a los testigos declarar; por tal razón, su apreciación merece gran respeto y deferencia por el tribunal apelativo. En ausencia de pasión, prejuicio, parcialidad, error manifiesto, y a menos que la apreciación de la evidencia se aleje de la realidad fáctica o que la prueba sea inherentemente imposible o increíble, el tribunal apelativo debe

abstenerse de intervenir con la apreciación de la evidencia hecha por el foro recurrido. <u>Pueblo v. Maisonave Rodríguez</u>, *supra*.

En el caso de autos no existe ninguna de las circunstancias anteriores. Por lo tanto, no debemos intervenir con la apreciación que de la prueba hiciera el tribunal de instancia tras tres (3) años de trámite procesal y una vista en su fondo. Más aún, cuando ambas partes aceptaron como hechos probados dichas determinaciones de hecho.[18]

Aclarado lo anterior, veamos entonces, si a la luz de los hechos de este caso, se configuró un discrimen por razón de embarazo como consecuencia del cambio adverso en las condiciones de trabajo de la señora Meléndez mientras ésta estaba embarazada.

B.

La Constitución del Estado Libre Asociado de Puerto Rico reconoce que la dignidad del ser humano es inviolable y que todos los ciudadanos son iguales ante la ley. Así, proscribe expresamente el discrimen por razón de sexo. Dispone, además, el derecho de "toda mujer en estado grávido o en época de lactancia" a recibir cuidados y ayudas especiales. Secs. 1 y 20 del Art. II de la Carta de Derechos de la Constitución de Puerto Rico, L.P.R.A. Tomo I.

Con el fin de instrumentar "estos principios de esencial igualdad humana", en el campo laboral se han aprobados varias leyes, como por ejemplo: la Ley Sobre Hostigamiento Sexual en el Empleo;[19] Ley para la Protección de Madres Obreras, *supra*; Ley Sobre Discrimen por Razón de Sexo en el Empleo;[20] y la Ley Antidiscrimen.[21]

---

[18] Durante el trámite apelativo ante el Tribunal de Circuito de Apelaciones, el Hospital retiró el proyecto de exposición narrativa estipulada de la prueba y no presentó objeción ante la resolución de dicho tribunal en cuanto a que el recurso se atendería y resolvería tomando como hechos probados las determinaciones de hecho del tribunal de instancia.

[19] Ley Núm. 17 de 22 de abril de 1988, 29 L.P.R.A. sec. 155 *et seq.*

En particular, la Ley para la Protección de Madres Obreras, *supra*, tiene el objetivo de equiparar las oportunidades de las mujeres y los hombres en el ámbito laboral, ya que siendo las mujeres quienes pueden quedar embarazadas, podrían resultar desfavorecidas por razón de esta condición biológica. Esta ley protege a la mujer respecto a su derecho a trabajar y su opción, constitucionalmente protegida, de concebir y tener hijos. De no existir esta protección, las mujeres trabajadoras tendrían que escoger entre trabajar sin concebir, por razón de su necesidad económica, o concebir y verse privadas de la oportunidad de trabajar y obtener ingresos. Informe de la Comisión Judicial Especial para Investigar el Discrimen por Género en los Tribunales de Puerto Rico, agosto de 1995, pág. 464.[22]

La prohibición contra el despido arbitrario e injustificado de una trabajadora durante la etapa de gestación busca evitar las consecuencias socioeconómicas que durante el embarazo y después del mismo podría conllevar tal despido. Informes de la Comisión de Derechos Civiles del Estado Libre Asociado de Puerto Rico, Vol. 2, ed. 1973, pág. 642; *citado en* Rivera Águila v. K-Mart de P.R., 132 D.P.R. 599, 608 (1989). El discrimen por razón de embarazo es probablemente el más pernicioso entre todas las conductas discriminatorias contra la mujer trabajadora, pues en éste los daños se multiplican al afectar a la madre y al hijo simultáneamente. Produciéndose, de este modo, un desbalance en el poder socioeconómico para el sector femenino.

---

[20] Ley Núm. 69 de 6 de julio de 1985, 29 L.P.R.A. sec. 1321 *et seq.*

[21] Ley Núm. 100 de 30 de junio de 1959, según enmendada, 29 L.P.R.A. sec. 146 *et seq.*

[22] Este Informe, además, reconoce que, a pesar de que la Ley para la Protección de Madres Obreras, *supra*, ha estado en vigor desde 1942, las estadísticas indican que el discrimen contra la mujer por razón de embarazo es un problema patente en la sociedad puertorriqueña. A la pág. 458.

En consideración a lo anterior, la Ley para la Protección de Madres Obreras, *supra*, dispone que el patrono no podrá despedir a una mujer embarazada sin justa causa. Aclara, además, que no se entenderá justa causa el menor rendimiento para el trabajo, en razón del embarazo. "Todo patrono que despida, suspenda, reduzca el salario, o **discrimine en cualquier forma contra una trabajadora por razón de la merma en su producción mientras ésta se encuentre en estado de embarazo** o rehúse restituirla en su trabajo luego del alumbramiento", incurrirá en violación de dicha ley.[23] (Énfasis suplido).

Con respecto a dicha disposición estatutaria, en <u>Rivera Águila v. K-Mart de P.R.</u>, *supra*, a la pág. 609, establecimos lo siguiente:

> La Ley Núm. 3, *supra*, forma parte de un esquema trazado por el Estado para ofrecerle a la mujer obrera una mayor garantía contra el discrimen en el trabajo por razón de sexo. **Mediante la Sec. 4 de la Ley Núm. 3, *supra*, se colocó a la mujer embarazada en una clasificación especial distinta a los demás empleados. Se reconoció que, por razón de su condición, el rendimiento en el trabajo podía quedar afectado durante el período de gestación y que era necesario brindarle una protección mayor que tomara en consideración la situación muy particular de la mujer obrera embarazada.** Para atender esta realidad, la Sec. 4 de la Ley Núm. 3, *supra*, varió la norma en cuanto al contenido... de justa causa para el despido. **No sólo prohibió al patrono el despedir de su empleo sin justa causa a una mujer embarazada, sino que también excluyó del concepto justa causa el menor rendimiento por razón del embarazo. Este menor rendimiento se refiere, no sólo al que se produce en términos cuantitativos, sino también al que afecta la calidad del trabajo realizado.** (Citas omitidas y énfasis suplido).

Según el texto y la jurisprudencia interpretativa de la Ley para la Protección de Madres Obreras, *supra*, el patrono incurrirá en responsabilidad civil cuando discrimine de cualquier forma contra una trabajadora por razón de la merma en su producción mientras ésta se encuentra en estado de embarazo. Lo que hay que demostrar es la ausencia de justa causa y no necesariamente que

---

[23] Sec. 4 de la Ley para la Protección de Madres Obreras, 29 L.P.R.A. sec. 469.

el patrono actuó con la intención de discriminar. Soc. de Gananciales v. Centro Gráfico, 144 D.P.R. 952 (1998). "La cuestión a ser resuelta no es si el despido [discrimen] fue motivado por la condición de embarazo de la demandante; la cuestión es si, estando embarazada la demandante, el patrono la despidió [discriminó en su contra] por causa justificada". Id.

En cuanto al trámite evidenciario de una acción entablada al amparo de la Ley para la Protección de Madres obreras, *supra*, hemos determinado que, una vez la obrera reclama el resarcimiento por haber sido despedida de su empleo sin justa causa mientras estaba embarazada, surge una presunción de despido injustificado que el patrono viene obligado a rebatir mediante preponderancia de la prueba. El peso de la prueba se desplaza de la parte demandante hacia el demandado, y es sobre éste que recae el *onus probandi*. Es el patrono, pues, quien tiene que probar que medio justa causa para el despido y a quien le corresponde persuadir al juzgador de la no-existencia del hecho presumido: el despido injustificado. Soc. de Gananciales v. Centro Gráfico, 144 D.P.R. 952 (1998); Rivera Águila v. K-Mart de P.R., *supra*; Hawayec v. A.F.F., 123 D.P.R. 526 (1989).

Es obvio que estas normas se extienden a casos como el presente en que, a pesar de que no se reclama que hubo un despido, se alega que se discriminó al alterarse las condiciones de trabajo de una mujer embarazada sin causa justificada. Pues en ambos casos, estamos ante una violación del mismo estatuto. Véase, la Sec. 4 de la Ley para la Protección de Madres Obreras, *supra*.

Teniendo en consideración los pronunciamientos anteriores, veamos los hechos del caso de marras.

III.

Coincidimos con la determinación del tribunal de instancia y del foro apelativo en cuanto a que en este caso la demandante está protegida por la Ley para la Protección de Madres Obreras, *supra*, y que debe prevalecer en su reclamación, ya que el patrono no rebatió la presunción de despido injustificado. Veamos.

En su Demanda, la señora Meléndez alegó que el Hospital violó las disposiciones de la Ley para la Protección de Madres Obreras, *supra*, porque la despojó de su horario regular de trabajo, sin justa causa, mientras estaba embarazada. Sostuvo además, que le asignaron relevar turnos en contravención a la orden médica y la despidieron mientras estaba disfrutando de su licencia de maternidad. A la luz de estas alegaciones, surgió a favor de la Sra. Meléndez una presunción de despido injustificado. Le correspondía entonces al patrono alegar justa causa para el despido, la cual no podía referirse a la merma en la producción de la Sra. Meléndez por razón de su embarazo. Debía además, persuadir al juzgador de la existencia de dicha justa causa.

En sus comparecencias ante el Tribunal de Primera Instancia, ante el Tribunal de Circuito de Apelaciones y ante nos, no encontramos expresión alguna por parte del Hospital respecto a la razón por la cual le alteró a la señora Meléndez sus condiciones de trabajo. Todas las justificaciones y defensas que presentó el Hospital se dirigen exclusivamente a justificar el despido de la señora Meléndez mientras alegadamente disfrutaba de su licencia de maternidad. El Hospital no refutó la alegación de la señora Meléndez en cuanto a que su causa de acción surgía bajo la Ley para la Protección de Madres Obreras, *supra*, por ésta haber sido discriminada al alterársele sus condiciones de trabajo como

consecuencia de la merma en su producción mientras estaba embarazada.

No obstante lo anterior, la Opinión del Tribunal sostiene lo siguiente:

> No importó para las [determinaciones de discrimen que hiciere el tribunal de instancia y el Tribunal de Circuito de Apelaciones] que el cambio se hubiera hecho **por una necesidad de empleo**, en vista de las ausencias y tardanzas de Meléndez. Es evidente que al poner a Meléndez en turnos rotativos, el impacto adverso de sus ausencias y tardanzas sobre los servicios de terapia respiratoria... se minimizaban al esparcirse o distribuirse entre los tres turnos de trabajo... Tampoco importó que el turno fijo que se le había concedido antes a Meléndez hubiese sido un privilegio especial que el Hospital le había otorgado, ya que ella no tenía un derecho como tal sobre el turno particular en cuestión. Nótese que todos los [terapeutas] respiratorios del Hospital trabajaban turnos rotativos de ordinario,..." (Énfasis en el original).

Sin embargo, es al Hospital, y no al Tribunal, a quien le corresponde alegar en su contestación y persuadir al juzgador de los hechos que medió justa causa para el cambio en el horario de trabajo de la señora Meléndez. No le corresponde a este Tribunal controvertir la evidencia presentada ante el Tribunal de Primera Instancia.[24] De todas formas, y contrario a lo que expresa la Opinión del Tribunal sin que el Hospital lo haya alegado, en este caso no podría decirse que las ausencias de la señora Meléndez constituyen justa causa para el cambio adverso en su horario de trabajo. Es precisamente esto lo que la Ley para la Protección de Madres Obreras, *supra*, proscribe al disponer que no se podrá discriminar "en cualquier forma contra una trabajadora por razón de la merma en su producción mientras ésta se encuentra en estado de embarazo". Véase: Soc. de Gananciales v. Centro

---

[24] Valga señalar, además, que la Opinión del Tribunal cita cierta literatura científica sobre el "carpal tunnel syndrome" que, según los autos ante nos, tampoco estuvo ante la consideración de los tribunales inferiores. Esta conducta ha sido fuertemente criticada en el pasado, lo que refleja una falta de consecuencia con la doctrina establecida por este mismo foro. Véase: Ríos Ruiz v. Mark, 119 D.P.R. 816 (1987).

Gráfico, *supra*. Valga recordar, además, que este menor rendimiento se refiere, no sólo al que se produce en términos cuantitativos, sino también al que afecta la calidad del trabajo realizado.

Por consiguiente, la señora Meléndez no podía ser despojada de su horario de trabajo regular para asignarle uno menos favorable en virtud de sus ausencias, las cuales fueron provocadas directamente por las complicaciones de salud con su embarazo. No estamos ante un caso en que el patrono altera las condiciones de trabajo de una obrera embarazada por sus problemas de absentismo. Este caso trata sobre un patrono que menoscaba las condiciones de trabajo de una obrera en estado de gestación, cuando ésta se ausenta de su empleo por razón de su condición de embarazo.

Asimismo, debemos destacar, en vista de que la Opinión del Tribunal sorpresivamente omite, que existía otra terapeuta respiratorio en el mismo horario fijo que la señora Meléndez, la cual se mantuvo en dicho horario. Por lo tanto, quedó evidenciado el trato desigual injustificado en el caso de autos.

De otra parte, el horario regular al que estaba asignada la señora Meléndez no puede catalogarse como un "privilegio especial". Según las determinaciones de hecho del tribunal de instancia, no controvertidas por el Hospital, fueron las cualidades profesionales de la señora Meléndez las que le lograron que ésta obtuviera un horario de trabajo regular permanente. ¿Cómo vamos a decir que cuando un obrero se esfuerza con dedicación en su trabajo y logra que sus condiciones de trabajo sean mejoradas no adquiere un derecho sobre ese nuevo término o condición de trabajo, que bien puede ser un aumento de sueldo o un horario más conveniente?

De lo anterior se desprende claramente que el Hospital carecía de justa causa para privar a la señora Meléndez de su horario de trabajo

regular permanente. El tribunal de instancia determinó que las ausencias periódicas de la señora Meléndez se debieron a sus complicaciones de salud causadas directamente por su estado de embarazo. Como expusimos previamente, la Ley para la Protección de Madres Obreras, *supra*, expresamente dispone que una disminución de la productividad de la trabajadora embarazada no puede interpretarse como causa que justifique un cambio adverso en sus condiciones de trabajo. Además, el Hospital no controvirtió la presunción de discrimen injustificado, siquiera alegó justa causa en este sentido.

Conforme a lo anterior, confirmaríamos la decisión del Tribunal de Circuito de Apelaciones y devolveríamos los autos al tribunal de instancia para que se precisen los daños correspondientes al cambio adverso en las condiciones de trabajo de la señora Meléndez a la luz de las disposiciones de la Ley para la Protección de Madres Obreras, *supra*.

Federico Hernández Denton
Juez Asociado