Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL V

| JUAN NEGRÓN RIVERA **Recurrido** V. WAL-MART PUERTO RICO INC. **Peticionario** | KLCE202401358 | *CERTIORARI* procedente del Tribunal de Primera Instancia Sala Superior de Carolina Caso Núm: CA2023CV00980 Sobre: Discrimen (Ley 100) Despido Injustificado (Ley 80) |
|---|---|---|

Panel integrado por su presidente, el Juez Hernández Sánchez, el Juez Bonilla Ortiz y la Jueza Mateu Meléndez.

**Hernández Sánchez, Juez Ponente**

### RESOLUCIÓN

En San Juan, Puerto Rico, a 7 de febrero de 2025.

El 16 de diciembre de 2024, Walmart Puerto Rico, Inc. (Walmart o peticionario) compareció ante nos mediante un recurso de *Certiorari* y solicitó la revisión de una *Resolución Interlocutoria* que se dictó el 13 de noviembre de 2024 y se notificó el 14 de noviembre de 2024, por el Tribunal de Primera Instancia, Sala Superior de Carolina (TPI). Mediante el aludido dictamen, el TPI declaró No Ha Lugar la *Moción de Sentencia Sumaria* promovida por el peticionario para que se desestimara con perjuicio la totalidad del pleito de epígrafe bajo el fundamento de ausencia de prueba de despido injustificado y discriminatorio.

Por los fundamentos que expondremos a continuación, **expedimos** el recurso de epígrafe y ***revocamos*** el dictamen recurrido.

-I-

El 30 de marzo de 2023, el Sr. Juan Negrón Rivera (señor Negrón o recurrido) presentó una *Querella* sobre despido injustificado y discrimen por razón de edad al amparo del

procedimiento sumario de la Ley Núm. 2 de 17 de octubre de 1961, según enmendada, mejor conocida como la *Ley de Procedimiento Sumario de Reclamaciones Laborales*, 32 LPRA sec. 3118 *et seq.*, en contra de Walmart.[1] En esta, alegó que, para diciembre de 2009, comenzó a trabajar como *Department Manager* para el peticionario en las facilidades de la tienda Walmart de Cayey donde permaneció por alrededor de tres (3) años. Además, adujo que, posteriormente fue trasladado a la tienda de Walmart en Carolina y ascendido a *Assistant Manager* donde trabajó durante un periodo de nueve (9) años hasta que fue despedido en octubre de 2021. Argumentó que su despido fue sin justa causa y discriminadamente por razón de su edad.

Expresó que durante los doce (12) años que laboró para Walmart mantuvo evaluaciones positivas, cumpliendo con las expectativas del negocio. Indicó que, para marzo de 2020, estaba a cargo de cinco (5) subdepartamentos. No obstante, puntualizó que, para ese tiempo se decretó en Puerto Rico un estado de emergencia por la pandemia del COVID-19 y, la tienda Walmart de Carolina tenía una plantilla menor a la necesaria para su buen funcionamiento. En este sentido, sostuvo que el peticionario comenzó un patrón discriminatorio e injustificado en su contra dirigido a crear un expediente de disciplina progresiva. Esbozó que, mediante el referido expediente, se identificó deficiencias en su labor que no eran atribuibles a éste. Del mismo modo, señaló que el procedimiento de disciplina progresiva no se efectuó conforme a los parámetros reglamentarios que Walmart instituyó y, que dicho despido estuvo motivado por razón de su edad.

Ahora bien, el recurrido alegó que por virtud del alegado patrón de discrimen se acogió a una licencia para solicitar ayuda

---

[1] Véase, págs. 1-7 del apéndice del recurso.

médica psiquiátrica. Asimismo, indicó que cuando regresó de su licencia lo pusieron a cargo de gerenciar departamentos adicionales, a pesar de las supuestas deficiencias en su labor. Ante ello, arguyó que era irreconciliable y contradictorio que, por un lado, se le sometiera a una disciplina progresiva y, por el otro, se le asignara mayor volumen de trabajo. Por tanto, sostuvo que, las presuntas deficiencias en su trabajo eran un subterfugio por parte de Walmart para encubrir el discrimen por edad. A tales efectos, esbozó que luego de haber sido despedido, sus tareas fueron asignadas a empleados más jóvenes.

En respuesta, el 14 de abril de 2023, Walmart presentó su *Contestación a Querella* en la cual negó la mayoría de las alegaciones.[2] Manifestó, que no discriminó contra el señor Negrón, ni por razón de su edad, ni por alguna otra razón protegida por ley. En este sentido, planteó que Walmart tenía políticas implementadas que prohibían el discrimen en el empleo e incluían procedimientos para la solución de asuntos relacionados al empleo, las cuales habían sido diseminadas a todos sus empleados. A tales efectos, adujo que el recurrido irrazonablemente falló en aprovecharse de estas, a pesar de que éste tenía conocimiento de éstas.

Por otra parte, sostuvo que, el desempeño del señor Negrón no cumplió con las expectativas de Walmart, lo cual justificó su despido. Aclaró que, la edad del recurrido no fue considerada como criterio en las decisiones tomadas por la compañía sobre el estatus de su empleo. Asimismo, señaló que el señor Negrón fue objeto de múltiples acciones correctivas y que el proceso de disciplina progresiva se llevó a cabo conforme establecido en la *Política de*

---

[2] Id., págs. 10-15.

*Acción Correctiva y Disciplinaria* de Walmart, lo cual culminó con el despido justificado.[3]

Tras varios tramites procesales, el 4 de octubre de 2024, las partes presentaron su *Informe de Conferencia con Antelación a Juicio.*[4] Mediante esta, estipularon los siguientes hechos:

1. Hiram Cruz nació en el año 1988.

2. Leyra Pérez nació en el año 1983.

3. Xavier Esquilín nació en el año 1984.

4. El demandante comenzó a trabajar para Walmart Puerto Rico, Inc. el 7 de diciembre de 2009.

5. Al momento de su fecha de comienzo en el empleo con Walmart el demandante contaba con 44 años de edad.

6. Al momento de su despido, el demandante se desempeñaba como Asistente de Gerente para Walmart.

7. El 28 de septiembre de 2021 el demandante Juan Negrón Rivera fue despedido.

8. Al 28 de septiembre de 2021, el demandante contaba con 56 años de edad.

10. Al 28 de septiembre de 2021, el demandante llevaba once (11) años trabajando para la parte demandada.

11. A tenor con la Ley Núm. 80-1976 al demandante le correspondería el pago de $35,469.45 como mesada, de éste prevalecer en su reclamo.[5]

Posteriormente, el 21 de octubre de 2024, Walmart presentó una *Solicitud de Sentencia Sumaria.*[6] En primer lugar, enumeró treinta y siete (37) hechos que, a su juicio, no estaban en controversia. Luego, argumentó que, en vista de los hechos propuestos, el derecho aplicable y la prueba documental incluida como parte de dicha moción, procedía dictar sentencia sumaria. Ello, toda vez que el señor Negrón no contaba con prueba suficiente

---

[3] Id., pág. 16. El 28 de abril de 2023, el TPI emitió una *Orden* que se notificó el 2 de mayo de 2023, mediante la cual convirtió el procedimiento en uno ordinario.

[4] Véase, págs. 19-59 del apéndice del recurso.

[5] Hacemos la salvedad que en el informe presentado las partes omitieron incluir el número nueve (9) en su listado, por lo cual, nosotros transcribimos el orden numérico tal cual.

[6] Id., págs. 60-685.

para sostener las causas de acción que invocaba. A tales efectos, señaló que el despido del recurrido fue el resultado de un proceso de disciplina progresiva prestablecido por Walmart, en el cual, se le hicieron señalamientos de deficiencias al recurrido con el propósito de corregir su desempeño. A pesar de esto, indicó que el señor Negrón no aprovechó las oportunidades ofrecidas, lo que resultó en su despido. En esta línea, argumentó que el proceso disciplinario adoptado por Walmart era uno razonable con el propósito de asegurar el buen funcionamiento de sus operaciones. Por tanto, arguyó que el despido del señor Negrón estuvo dirigido a mantener el buen y normal funcionamiento de la compañía y no por intención discriminatoria o represalia alguna.

En respuesta, el 12 de noviembre de 2024, el señor Negrón presentó su *Oposición a Solicitud de Sentencia Sumaria*.[7] En primer lugar, señaló los hechos que consideraba que estaban en controversia y los que no. Luego, argumentó que Walmart no contaba con prueba suficiente para justificar su despido, ni contaba con prueba que demostrara que no discriminó por razón de su edad. Asimismo, sostuvo que cuando Walmart lo separó de su empleo se apartó de sus propias políticas establecidas.

Evaluados los escritos de las partes, el 13 de noviembre de 2024, el TPI emitió una *Resolución Interlocutoria* que se notificó al día siguiente, en la cual determinó lo siguiente[8]:

> El Tribunal determina que no existen controversia reales y sustanciales sobre los hechos estipulados en dicho informe quedando en controversia todos los demás hechos. Los hechos que están en controversia versan sobre elementos subjetivos como credibilidad que impiden dictar sentencia sumaria en estos momentos. Al determinar "si existen controversias de hechos que impiden dictar sentencia sumaria, el tribunal debe analizar los documentos que acompañan la solicitud de sentencia sumaria y los documentos incluidos con la moción en oposición, así como los que obren en el expediente". Cruz Marcano v. Sánchez

---

[7] Id., págs. 685-1367.
[8] Id., págs. 1372-1375.

Tarazona, *supra*. Esta determinación debe ser guiada por el principio de liberalidad a favor de la parte que se opone a que se dicte sentencia sumaria. Cuevas Segarra, op cit., pág. 591. Este análisis liberal persigue evitar la privación del derecho de todo litigante a su día en corte cuando existen controversias de hechos legítimos y sustanciales que deben ser resueltas. Roig Com. Bank v. Rosario Cirino, 126 D.P.R. 613 (1990). Conforme a lo antes expuesto, se declara No Ha Lugar, la Solicitud de Sentencia Sumaria presentada por la parte Querellada.

Inconforme, el 16 de diciembre de 2024, Walmart presentó el recurso de epígrafe y formuló los siguientes señalamientos de error:

A. **Erró el TPI al, a solo horas de haberse presentado la *oposición*, emitir *Resolución* denegando la *MSS*, abdicando así su responsabilidad de revisar, ponderar y considerar la *MSS* y la *oposición*.**

B. **Erró el TPI al indicar en su *Resolución* que los únicos hechos que están incontrovertidos son los que las partes incluyeron como estipulados en el *Informe de Conferencia con Antelación al Juicio*, cuando en su *oposición el* recurrido aceptó hechos adicionales de los relacionados por Walmart en su *MSS* como incontrovertidos, evidenciando que ni siquiera leyó la *MSS* de Walmart.**

C. **Erró el TPI al denegar la *MSS* de Walmart cuando la misma demuestra que no existe hecho material alguno en controversia que impida disponer del pleito en su totalidad por la vía sumaria y que procede como cuestión de derecho.**

D. **Erró el TPI al, no empece estar notificado por adelantado que Walmart presentaría una *MSS*, requerirles a las partes la redacción y presentación de un *Informe de Conferencia* con antelación al juicio provocando que las partes incurrieran en gastos innecesarios adelantando así con esto su decisión de denegar la *MSS* de Walmart sin siquiera esta haberse presentado.**

E. **Erró el TPI al denegar la *MSS* de Walmart mediante pasión, prejuicio, parcialidad y error manifiesto.**

Por su parte, el 26 de diciembre de 2024, el señor Negrón presentó su *Oposición a Expedición de Auto y Solicitud de Desestimación por Incumplimiento con las Reglas del Tribunal de Apelaciones*. Posteriormente, el 9 de enero de 2025, emitimos una

*Resolución* ordenándole al Hon. Lizardo W. Mattei Román, Juez del Tribunal de Primera Instancia, Sala Superior de Carolina, que en el término de diez (10) días fundamentara su *Resolución Interlocutoria* del 13 de noviembre de 2024, notificada al día siguiente. Conforme ordenado, el 22 de enero de 2025, el Hon. Mattei Román presentó su *Resolución en Cumplimiento de Orden*. En esencia, señaló los hechos y documentos que las partes estipularon en el *Informe de Conferencia con Antelación a Juicio* y, sobre los cuales entendía que existía controversia. Evaluado el Informe, la moción de sentencia sumaria y la oposición a dicha moción, el Hon. Mattei Román concluyó que los hechos propuestos por las partes en sus respectivas mociones estaban en controversia. Ello, en adición a los ya estipulados. Reiteró que los hechos en controversia versaban sobre asuntos de credibilidad y les correspondía a las partes probar los mismos mediante prueba fehaciente.

Por su parte, el 29 de enero de 2025, Walmart presentó su *Moción en Torno a Resolución Enmendada del TPI*. En esencia, alegó que dicha *Resolución* no incluía información adicional y sustancial a la *Resolución* original emitida por el TPI. A su vez, adujo que el Hon. Mattei Román aseveró que los únicos hechos que no estaban en controversia eran los que las partes habían estipulado. Resaltó, que el Hon. Mattei Román abdicó en su función de adjudicar la *Solicitud de Sentencia Sumaria*.

Con el beneficio de la comparecencia de ambas partes, procedemos a resolver el asunto ante nuestra consideración. *Veamos*.

## II.

### -A-

El *certiorari* es el vehículo procesal extraordinario utilizado para que un tribunal de mayor jerarquía pueda corregir un error de derecho cometido por un tribunal inferior. *Torres González v.*

*Zaragoza Meléndez,* 211 DPR 821, 846-847 (2023). Los tribunales apelativos tenemos la facultad para expedir un *certiorari* de manera discrecional. Íd., pág. 847. Esta discreción se define como "el poder para decidir en una u otra forma, esto es, para escoger entre uno o varios cursos de acción". *García v. Padró,* 165 DPR 324, 334 (2005). Asimismo, discreción es una forma de razonabilidad aplicada al discernimiento judicial para llegar a una conclusión justa. Íd., pág. 335. Ahora bien, la aludida discreción que tiene este foro apelativo para atender un *certiorari* no es absoluta. Íd. Esto ya que no tenemos autoridad para actuar de una forma u otra, con abstracción total al resto del derecho, pues ello constituiría abuso de discreción. Íd. Así, "el adecuado ejercicio de la discreción judicial esta inexorable e indefectiblemente atado al concepto de la razonabilidad". Íd.

La Regla 52.1 de Procedimiento Civil, 32 LPRA Ap. V, R. 52.1, establece que el recurso de *certiorari* para resolver resoluciones u órdenes interlocutorias dictadas por el Tribunal de Primera Instancia, será expedido por el Tribunal de Apelaciones cuando se recurre de: (1) una resolución u orden bajo la Regla 56 (Remedios Provisionales) y la Regla 57 (*Injunction*) de las Reglas de Procedimiento Civil; (2) la denegatoria de una moción de carácter dispositivo y; (3) por excepción de: (a) decisiones sobre la admisibilidad de testigos de hechos o peritos esenciales; (b) asuntos relativos a privilegios probatorios; (c) anotaciones de rebeldía; (d) casos de relaciones de familia; (e) casos que revistan interés público; y (f) cualquier otra situación en la que esperar a la apelación constituiría un fracaso irremediable de la justicia.

En otros términos, la Regla 40 del Tribunal de Apelaciones, 4 LPRA Ap. XXII-B establece lo siguiente:

> El tribunal tomará en consideración los siguientes criterios al determinar la expedición de un auto de certiorari o de una orden de mostrar causa:

(A) Si el remedio y la disposición de la decisión recurrida, a diferencia de sus fundamentos, son contrarios a derecho.

(B) Si la situación de hechos planteada es la más indicada para el análisis del problema.

(C) Si ha mediado prejuicio, parcialidad o error craso y manifiesto en la apreciación de la prueba por el Tribunal de Primera Instancia.

(D) Si el asunto planteado exige consideración más detenida a la luz de los autos originales, los cuales deberán ser elevados, o de alegatos más elaborados.

(E) Si la etapa del procedimiento en que se presenta el caso es la más propicia para su consideración.

(F) Si la expedición del auto o de la orden de mostrar causa no causan un fraccionamiento indebido del pleito y una dilación indeseable en la solución final del litigio.

(G) Si la expedición del auto o de la orden de mostrar causa evita un fracaso de la justicia. 4 LPRA Ap. XXII-B, R. 40.

Ninguno de estos criterios es determinante por sí solo para el ejercicio de jurisdicción y tampoco constituyen una lista exhaustiva. *García v. Padró*, supra, pág. 335. La norma vigente es que los tribunales apelativos podremos intervenir con las determinaciones discrecionales del Tribunal de Primera Instancia cuando este haya incurrido en arbitrariedad, craso abuso de discreción o en un error en la interpretación o aplicación de cualquier norma procesal o de derecho sustantivo. *Pueblo v. Rivera Santiago*, 176 DPR 559, 581 (2009).

**-B-**

El mecanismo de sentencia sumaria provisto en la Regla 36 de Procedimiento Civil, 32 LPRA. Ap. V, R. 36, tiene el propósito primordial de proveer una solución justa, rápida y económica en aquellos casos en que surja de forma clara que no existen controversias materiales de hechos que requieren ventilarse en un juicio plenario y el derecho así lo permita. *Meléndez González et al. v. M. Cuebas*, 193 DPR 100, 109 (2015).

Particularmente, la Regla 36.2 de Procedimiento Civil, 32 LPRA Ap. V, R. 36.2, permite que cualquier parte presente una moción, basada o no en declaraciones juradas, para que se dicte sentencia sumaria a su favor sobre la totalidad o alguna parte de la reclamación. *Municipio de Añasco v. ASES et al.*, 188 DPR 307, 326 (2013). Al solicitar dicho remedio, la parte que promueve la sentencia sumaria "deberá establecer su derecho con claridad y demostrar que no existe controversia sustancial sobre algún hecho material, o sea, sobre ningún componente de la causa de acción". Íd.

Solicitada la sentencia sumaria basada en declaraciones juradas o en documentos admisibles en evidencia, la parte que se opone a la sentencia sumaria no puede tomar una actitud pasiva y descansar en las aseveraciones o negaciones consignadas en su alegación. *Roldán Flores v. M. Cuebas et al.*, 199 DPR 664, 677 (2018). Por el contrario, dicha parte tiene que refutar los hechos alegados y sustanciar su posición con prueba consistente en contradeclaraciones juradas y contradocumentos que pongan en controversia los hechos presentados por el promovente. Íd. Es decir, esa persona viene obligada a enfrentar la moción de su adversario de forma tan detallada y especifica como lo ha hecho el promovente en su solicitud puesto que, si incumple con lo antes mencionado corre el riesgo de que se dicte sentencia es su contra. Regla 36.3 de Procedimiento Civil, *supra*; *SLG Zapata- Rivera v. J.F. Montalvo*, 189 DPR 414, 432 (2013).

Ahora bien, según estableció el Tribunal Supremo en el caso *Vera v. Dr. Bravo*, 161 DPR 308, 334-335 (2004), los foros revisores utilizarán los mismos criterios que el Tribunal de Primera Instancia al determinar si procede una sentencia sumaria. Sobre el particular, en *Meléndez González et al. v. M. Cuebas,* supra*, pág. 118, el Tribunal Supremo estableció que al revisar una determinación del

foro primario en la que se concedió o denegó una moción de sentencia sumaria debemos: (1) examinar de *novo* el expediente; (2) revisar que la moción de sentencia sumaria y su oposición cumplan con los requisitos de forma codificados en la Regla 36 de Procedimiento Civil, *supra,* y con los discutidos en *SLG Zapata-Rivera v. J. Montalvo, supra;* (3) en el caso de una revisión de una sentencia dictada sumariamente, debemos revisar si en realidad existen hechos materiales en controversia, y de haberlos, exponer concretamente cuáles están en controversia y cuáles no; y (4) de encontrar que los hechos materiales no están en controversia, debemos revisar de *novo* si el TPI aplicó correctamente el derecho. Véase, además, *Rivera Matos, et al. v. Triple-S et al.,* 204 DPR 1010, 1025 (2020).

Del mismo modo, el Tribunal Supremo ha reiterado que a menos que existan circunstancias extraordinarias o indicios de pasión, prejuicio, parcialidad o error manifiesto y que la apreciación de la prueba se distancie de la realidad fáctica o esta sea inherentemente imposible o increíble, el tribunal apelativo deberá abstenerse de intervenir con las determinaciones de hechos, la apreciación de la prueba y las adjudicaciones de credibilidad hechas por el juzgador de los hechos. *Flores v. Soc. de Gananciales*, 146 DPR 45, 49 (1998). En otras palabras, las determinaciones que hace el juzgador de los hechos no deben ser descartadas arbitrariamente ni tampoco deben sustituirse por el criterio del foro apelativo, a menos que de la prueba admitida surja que no existe base suficiente que apoye tal determinación. *Rolón v. Charlie Car Rental Inc.,* 148 DPR 420, 433 (1999).

**-C-**

La Ley Núm. 80 del 30 de mayo de 1976, según enmendada, mejor conocida como *Ley Sobre Despidos Injustificados,* 29 LPRA sec. 185a *et seq.* (Ley Núm. 80-1976) fue creada con el fin

primordial de proteger, de manera más efectiva, el derecho del obrero puertorriqueño a la tenencia de su empleo.[9]  A su vez, procura desalentar la práctica de despedir a los empleados de forma injustificada y otorga a los trabajadores remedios justicieros y consustanciales con los daños causados por un despido injustificado. Véase: Exposición de Motivos de la Ley Núm. 80-1976, *supra.*; SLG *Zapata-Rivera v. J.F. Montalvo*, 189 DPR 414, 424 (2013). Ello ya que, en la relación obrero-patronal, los trabajadores son la parte más débil. *Orsini García v. Srio. de Hacienda*, 177 DPR 596, 618 (2009). Así, la referida disposición legal "garantiza a todo empleado que trabaje mediante remuneración de alguna clase y que sea contratado por tiempo indeterminado, una compensación por su patrono –además del sueldo devengado– en caso de ser despedido sin justa causa". *López Fantauzzi v. 100% Natural*, 181 DPR 92, 108 (2011).

Cabe precisar que, la Ley Núm. 80-1976, *supra*, no define el término justa causa. *Jusino et als. v. Walgreens*, 155 DPR 560, 572 (2001). Sin embargo, enumera una serie de circunstancias que justifican el despido de un empleado. Íd. Al respecto, el Art. 2 la legislación en cuestión estatuye, 29 LPRA sec. 185b, entre otras cosas, que se consideran justa causa para el despido:

(a) Que el empleado incurra en un patrón de conducta impropia o desordenada.

(b) Que el empleado incurra en un patrón de desempeño deficiente, ineficiente, insatisfactorio, pobre, tardío o negligente. Esto incluye incumplir con normas y estándares de calidad y seguridad del patrono, baja productividad, falta de competencia o habilidad para realizar el trabajo a niveles razonables requeridos por el patrono y quejas repetidas de los clientes del patrono.

(c) Violación reiterada por el empleado de las reglas y reglamentos        razonables        establecidos        para        el

---

[9] En el 2017, la Ley Núm. 80, *supra*, sufrió unos cambios sustanciales a raíz de la aprobación de la Ley Núm. 4-2017, 29 LPRA sec. 121 *et seq.*, mejor conocida como la *Ley de Transformación y Flexibilidad Laboral*, que entró en vigor el 26 de enero de 2017 (Ley Núm.4-2017). Sin embargo, dichas enmiendas no son aplicables al apelante toda vez que fue reclutado previo a la vigencia de la referida Ley Núm.4-2017.

funcionamiento del establecimiento siempre que copia escrita de los mismos se haya suministrado oportunamente al empleado.

(d) Cierre total, temporero o parcial de las operaciones del establecimiento. En aquellos casos en que el patrono posea más de una oficina, fábrica, sucursal o planta, el cierre total, temporero o parcial de las operaciones de cualquiera de estos establecimientos donde labora el empleado despedido, constituirá justa causa para el despido a tenor con este Artículo.

(e) Los cambios tecnológicos o de reorganización, así como los de estilo, diseño o naturaleza del producto que se produce o maneja por el establecimiento y los cambios en los servicios rendidos al público.

(f) Reducciones en empleo que se hacen necesarias debido a una reducción en el volumen de producción, ventas o ganancias, anticipadas o que prevalecen al ocurrir el despido o con el propósito de aumentar la competitividad o productividad del establecimiento.

**-D-**

La Ley Núm. 100 de 30 de junio de 1959, según enmendada, conocida como *Ley Antidiscrimen de Puerto Rico*, 29 LPRA sec. 146 *et seq.* (Ley Núm. 100-1959), prohíbe el discrimen en el empleo de un patrono contra un empleado por razón de su raza, edad, color, *sexo*, origen social o nacional, condición social, afiliación o ideas políticas y religión. *López Fantauzzi v. 100% Natural,* supra, pág. 121. Este estatuto incorpora el lenguaje proveniente del Art. II Sec. 1 de la Constitución del Estado Libre Asociado de Puerto Rico, el cual prohíbe el discrimen en las clasificaciones allí mencionadas. *Garib Bazain v. Hosp. Español Auxilio Mutuo de Puerto Rico*, 204 DPR 601, 615 (2020). No obstante, al momento de la aprobación de esta legislación se añadió una categoría protegida adicional, la edad. Íd. Así pues, la referida ley prohíbe y penaliza el discrimen en el empleo. *Segarra Rivera v. Intl. Shipping et al.*, supra, pág. 988. Ahora bien, a pesar de que el estatuto no define el término discrimen, nuestro más Alto Foro ha expresado que existe discrimen "cuando ocurre un *trato desigual injustificado*; es decir, cuando alguna persona sufre una desigualdad por prejuicio o por arbitrariedad, sin que exista un

fundamento razonable para la falta de trato igual". *Meléndez v. Asoc. Hosp. Del Maestro*, 156 DPR 828, 845 (2002).

El Art. 3 de la Ley Núm. 100-1976, *supra*, establece que "[s]e presumirá que cualquiera de los actos mencionados en los Artículos precedentes fue cometido en violación de esta Ley, cuando el mismo haya sido realizado sin justa causa. Esta presunción será de carácter controvertible". Esto quiere decir que, para que proceda la activación de la presunción de discrimen al amparo del precitado artículo, es necesario que el empleado pruebe que fue despedido sin justa causa y que existe la modalidad del discrimen alegado. *Diaz v. Wyndham Hotel Corp.,* 155 DPR 364, 384 (2001). Particularmente, cuando el empleado alegue discrimen por edad, este tiene el deber de presentar prueba que establezca lo siguiente: (1) que pertenece a la clase protegida por la Ley Núm. 100-1979, *supra*, a saber, su edad; (2) que estaba cualificado para ejercer el puesto que ocupaba; (3) que fue despedido; (4) que fue sustituido por una persona más joven, esto es, algún hecho base que lo ubique dentro de la modalidad bajo la cual reclama. *Segarra Rivera v. Intl. Shipping et al.*, supra, págs. 989-990.

Así pues, una vez el empleado pruebe un caso *prima facie* de discrimen por razón de edad, el patrono tendrá la obligación de rebatir la presunción activada de la siguiente manera, a saber, (1) derrotar la ausencia de justa causa y (2) derrotar el hecho de que el despido fue por motivos discriminatorios. Íd., pág. 990. Cabe precisar que, aun cuando el Tribunal determine que el despido fue sin justa causa, el patrono también puede presentar prueba que el despido no fue discriminatorio. Íd. Para rebatir la presunción de que el despido no fue justificado, "basta con que el patrono pruebe, incluso con evidencia circunstancial, que la razón para tal acto no fue discriminatoria." Íd. Si el patrono logra derrotar la presunción de discrimen del Art. 3 de la Ley Núm. 100-1976, *supra*, el empleado

aun tendrá oportunidad para probar su caso, entiéndase demostrar que hubo discrimen, pero esta vez lo tendrá que hacer sin el beneficio de la presunción. S.L.G *Hernández Beltrán v. TOLIC.,* 151 DPR 754, 775 (2000).

Por último, es importante resaltar que, cuando un patrono despide a un empleado con justa causa, no puede ser responsable de discrimen al amparo de la Ley Núm. 100, *supra. Segarra Rivera v. Intl. Shipping et al.*, supra, pág. 989. Por otra parte, "si una vez se presente la totalidad de la prueba y queda demostrado que no hubo ánimo o intención discriminatoria en el despido, pero el demandado [...] no probó la justa causa, el tribunal deberá concluir que el despido fue injustificado y el empleado será acreedor, exclusivamente, a los remedios establecidos en la Ley Núm. 80". Íd., pág. 990.

III.

En su recurso, el peticionario solicita la revisión de la de una *Resolución Interlocutoria* que se dictó el 13 de noviembre de 2024 y se notificó el 14 de noviembre de 2024. En esta, el TPI declaró No Ha Lugar la *Moción de Sentencia Sumaria* presentada por el peticionario para que se desestimara con perjuicio la totalidad del pleito de epígrafe bajo el fundamento de ausencia de prueba de despido injustificado y discriminatorio. En vista de ello, en su primer señalamiento de error argumentó que el TPI erró al emitir una *Resolución* denegando la moción de sentencia sumaria, ello a solo horas de haberse presentado la oposición a dicha moción y, abdicando así su responsabilidad de revisar, ponderar y considerar la moción de sentencia sumaria y la oposición. Asimismo, en su segundo señalamiento de error planteó que el TPI incidió al indicar en su *Resolución* que los únicos hechos que estaban incontrovertidos eran los que las partes incluyeron como estipulados en el *Informe de Conferencia con Antelación al Juicio.*

Afirmó que, en su oposición, el recurrido aceptó hechos adicionales de los relacionados por Walmart en su moción de sentencia sumaria como incontrovertidos.

Por otro lado, en su tercer señalamiento de error, el peticionario arguyó que el TPI erró al denegar la moción de sentencia sumaria de Walmart cuando ésta demostraba que no existía hecho material alguno en controversia que impidiera disponer del pleito en su totalidad por la vía sumaria y, que procedía como cuestión de derecho. En su cuarto señalamiento de error, adujo que el TPI incidió al requerirle a las partes la redacción y presentación de un *Informe de Conferencia con Antelación a Juicio* provocando que las partes incurrieran en gastos innecesarios. Ello, cuando adelantó su decisión de denegar la moción de sentencia sumaria sin siquiera esta haberse presentado. Por último, en su quinto señalamiento de error alegó que el TPI erró al denegar la moción de sentencia sumaria mediante pasión, prejuicio, parcialidad o error manifiesto.

Cabe precisar que, al momento de revisar la concesión de una solicitud de sentencia sumaria, nos encontramos en la misma posición que el TPI. Además, resaltamos que debemos revisar dicha solicitud de *novo*, toda vez que el TPI incumplió con la *Resolución* que emitió este Tribunal y la Regla 36 de Procedimiento Civil, 32 LPRA Ap. V, R.36, puesto que no especificó los hechos que estaban en controversia. Así pues, en primer lugar, debemos evaluar si al presentar la solicitud de sentencia sumaria y su oposición las partes cumplieron con los requisitos de forma establecidos en la Regla 36.3 de Procedimiento Civil, *supra*, y con los dispuesto en *SLG Zapata-Rivera v. J.F. Montalvo, supra*. Al evaluar los escritos presentados por las partes resolvemos que, en esencia, ambas cumplieron con los referidos requisitos. Resuelto lo anterior, nos corresponde evaluar si existen hechos materiales en controversia que nos impidan dictar sentencia sumaria. *Veamos.*

En su dictamen el TPI acogió once (11) determinaciones de hechos, las cuales fueron estipuladas por las partes en el *Informe de Conferencia con Antelación a Juicio*, por entender que no existía controversia de hechos sobre ello. Estas leen como sigue:

1. El Sr. Hiram Cruz nació en el año 1988.

2. La Sra. Leyra Pérez nació en el año 1983.

3. El Sr. Xavier Esquilín nació en el año 1984.

4. El Sr. Francisco Crespo nació en el año 1965.

5. El señor Negrón comenzó a trabajar para Walmart Puerto Rico, Inc. el 7 de diciembre de 2009.

6. Al momento de su fecha de comienzo en el empleo con Walmart el señor Negrón contaba con 44 años.

7. Al momento de su despido, el señor Negrón se desempeñaba como Asistente de Gerente para Walmart.

8. El 28 de septiembre de 2021 el señor Negrón fue despedido. Véase documento *Exit Interview*.

9. Al 28 de septiembre de 2021, el señor Negrón contaba con 56 años.

10. Al 28 de septiembre de 2021, el señor Negrón llevaba once (11) años trabajando para Walmart.

11. A tenor con la Ley Núm. 80-1976 al señor Negrón le correspondería el pago de $35,469.45 como mesada, de este prevalecer en su reclamo.

Cónsono con lo anterior, adoptamos dichas determinaciones de hechos en su totalidad. Sin embargo, consideramos de suma importancia añadir los siguientes hechos incontrovertidos adicionales:

12. Luego del despido del señor Negrón, las funciones de Asistente de Gerente de este, fueron asumidas y redistribuidas entre el Sr. Hiram Cruz, la Sra. Leyra Pérez, el Sr. Xavier Esquilín y el Sr. Francisco Crespo.

13. Walmart aprobó y mantenía en vigor una *Política de Acciones Disciplinarias*. La versión vigente al momento de los hechos del caso de epígrafe era de 14 de diciembre de 2018.

14. A tenor con la *Política de Acciones Disciplinarias* de Walmart, las medias disciplinarias tenían un periodo de vigencia de doce (12) meses.

15. El señor Negrón recibió tres (3) medidas disciplinarias, las cuales fueron firmadas por este. Estas fueron las siguientes:

   a. *Primera Nivel de Acción Disciplinaria*: 20 de junio de 2020. En la misma fecha, el señor Negrón presentó un *Plan de Acción*.

   b. *Segundo Nivel de Acción Disciplinaria*: 18 de septiembre de 2020. Para la misma fecha, a saber, el 18 de octubre de 2020, el recurrido presentó un *Plan de Acción de Nivel de Asesoría*.

   c. *Tercer Nivel de Acción Disciplinaria*: 19 de marzo de 2021.

16. El señor Negrón conocía y estaba familiarizado con la *Política de Acciones Disciplinarias* de Walmart.

17. El señor Negrón firmó varias *Hojas de Notas* o conversaciones documentadas, las cuales contenían un resumen de las observaciones y áreas a mejorar del señor Negrón. Específicamente, el señor Negrón recibió *Hoja de Notas* en las fechas siguientes:

   a. Hoja de Notas: 9 de mayo de 2020.
   b. Hoja de Notas: 19 de marzo de 2021.
   c. Memorando: 4 de agosto de 2020.
   d. Hoja de Notas: 23 de enero de 2021.

18. Walmart contaba con una política de *Prevención de Discrimen y Hostigamiento* en el empleo. Dicha política prohibía el discrimen por raza, sexo, edad, orientación sexual, identidad de género, origen social o nacional, condición social, afiliación política, ideas políticas o religiosas, embarazo, discapacidad, estatus civil, estatus de veterano, información genética, o por ser víctima o ser percibida como víctima de violencia doméstica, agresión sexual o acecho, o cualquier otro estatus legalmente protegido.

19. El señor Negrón firmó acuse de recibo con relación a la política de *Prevención de Discrimen y Hostigamiento* en el empleo el 12 de noviembre de 2018.

Luego de revisar la totalidad del expediente, examinados los argumentos de las partes y aquilatada la prueba documental que obra en el expediente, concluimos que no existen hechos sustanciales en controversia que nos impidan dictar sentencia sumaria. Dicho lo anterior, nos resta determinar lo siguiente: (1) si el señor Negrón tenía prueba de despido injustificado cuando fue despedido como resultado de un proceso de disciplina progresiva

conforme a las políticas razonables del patrono y que el recurrido conocía; (2) si la justificación para el despido derrotaba automáticamente la reclamación de despido discriminatorio por edad; y finalmente, (3) si el señor Negrón no tenía prueba para establecer su reclamación de despido discriminatorio por razón de edad.

Discutiremos los señalamientos de error segundo, tercero y quinto en conjunto por estar íntimamente relacionados entre sí. En esencia, Walmart argumentó que procedía dictar sentencia sumaria conforme a la Regla 36 de Procedimiento Civil, *supra*, y dictar sentencia desestimando con perjuicio la causa de acción por despido injustificado y discrimen en el empleo, toda vez que surgía de las alegaciones y los documentos que acompañaban la moción de sentencia sumaria, que el recurrido no podía prevalecer en su *Querella*. Sostuvo que la celebración de un juicio plenario en el caso de epígrafe resultada innecesario.

Surge del expediente ante nuestra consideración que Walmart tenía una *Política de Acciones Disciplinarias* la cual proveía instrucciones y orientación sobre los procedimientos a seguir cuando: (1) el desempeño del empleado no cumplía con las expectativas y estándares para los asociados en la misma posición o una posición similar y, (2) la conducta era contraria a una o más valores de la empresa. Respecto a las acciones disciplinarias, dicho manual establecía que el empleado únicamente podía recibir un escrito de cada nivel de acción disciplinaria en un periodo de doce (12) meses, para un total de tres (3) escritos previo al despido. A su vez, aclaraba que, si una acción disciplinaria subsecuente era necesaria, el empleado recibiría otro nivel, independientemente si se trataba de una conducta o desempeño laboral que no cumpliera con las expectativas, o por haber infringido alguna política o ley

aplicable, igual o distinta a las acciones disciplinarias en tu expediente.

Particularmente, como mencionamos anteriormente, la política disponía un procedimiento de tres (3) escritos previo al despido del empleado. En cuanto al primer escrito, la política de la compañía indicaba que el gerente o supervisor utilizaría un primer escrito para notificar al empleado que no estaba cumpliendo con las expectativas o infringió alguna política o ley aplicable. Mediante este primer escrito, el empleado tenía la oportunidad de identificar, reconocer y comprometerse a corregir y mejorar con el propósito de cumplir con las expectativas de su puesto. Respecto al segundo escrito, la política disponía que el gerente o supervisor remitiría un segundo escrito para notificar al empleado que no estaba cumpliendo con las expectativas o infringió alguna política o ley aplicable. Cabe precisar que, si el empleado recibía un segundo escrito, era requerido someter un plan de acción que fuera alcanzable y medible. Dicho plan de acción tenía que presentarse en un término de veinticuatro (24) horas a partir del recibo de la acción disciplinaria.

Finalmente, en cuanto al tercer escrito, el gerente o supervisor le informaba al empleado sobre conducta o desempeño laboral inadecuado. Cabe precisar que, era posible que el empleado tuviese un primer o segundo escrito, o que el gerente hubiese determinado que las circunstancias justificaban un nivel mayor de responsabilidad. De igual forma, el empleado tenía que establecer un plan de acción. Ahora bien, si correspondía una nueva acción disciplinaria y, el empleado había recibido un tercer escrito en el periodo de doce (12) meses previos al mismo, estaba sujeto a despido o terminación de empleo.

Según el derecho previamente expuesto la Ley Núm. 80-1976, *supra,* no define el término justa causa. *Jusino et als. v. Walgreens,*

155 DPR 560, 572 (2001). Sin embargo, enumera una serie de circunstancias que justifican el despido de un empleado. Íd. Al respecto, el Art. 2(b) la legislación en cuestión estatuye, entre otras cosas, que se consideran justa causa para el despido que el empleado incurra en un patrón de conducta impropia o desordenada y, que el empleado incurra en un patrón de desempeño deficiente, ineficiente, insatisfactorio, pobre, tardío o negligente. Esto incluye incumplir con normas y estándares de calidad y seguridad del patrono, baja productividad, falta de competencia o habilidad para realizar el trabajo a niveles razonables requeridos por el patrono y quejas repetidas de los clientes del patrono.

Surge del expediente ante nuestra consideración, que el señor Negrón recibió un primer nivel de acción disciplinaria el 20 de junio de 2020. Mediante esta, el gerente le notificó que en la noche del 15 de junio de 2020 y la madrugada del 16 de junio de 2020, cuando la tienda permanecía cerrada, este compró tres (3) piscinas utilizando dos (2) tarjetas de descuentos diferentes con los nombres de Josué Lugo y Brenda Rosa y dos (2) tarjetas bancarias distintas. En dicho escrito, el gerente indicó que una de las piscinas fue entregada a un vehículo donde estaba el asociado Josué Lugo y la segunda fue entregada al vehículo del señor Negrón. Aclaró que, la tercera piscina se quedó en el almacén en un *shopping cart.* El gerente, enfatizó que dicha conducta se consideraba un *under stocking*, toda vez que la mercancía nunca salió al piso de venta ni estuvo disponible para los clientes de las tiendas Walmart. Además, señaló que el señor Negrón utilizó una tarjeta de descuento que no le pertenecía y, que ello no era permitido en las tiendas Walmart.

Posteriormente, el 18 de septiembre de 2020, el recurrido recibió un segundo nivel de acción disciplinaria. En este, el gerente le notificó al señor Negrón que parte de sus responsabilidades operacionales incluía realizar y discutir evaluaciones con el personal

a su cargo. Puntualizó, que el recurrido realizó evaluaciones tardías a los empleados y, ello constituía una violación a los procesos de la compañía. Adicionalmente, explicó que el equipo de trabajo del recurrido incurrió en *overtime* no autorizado desde el 15 de agosto de 2020 hasta el 8 de septiembre de 2020, para un total de 51.62 horas por séptimo día, 12.40 por *meal premium* y 16.37 más de ocho (8) horas. De dicho documento se desprende que, se esperaba que el señor Negrón realizara las evaluaciones a tiempo y, organizara los horarios de los empleados para no incurrir en *overtime*. Según lo exige la política de la compañía, el señor Negrón realizó un plan de acción a los fines de tomar las medidas necesarias para corregir los asuntos discutidos en el segundo escrito.

Finalmente, el 19 de marzo de 2021, el señor Negrón recibió un tercer escrito, en el cual se le notificó que su equipo de trabajo continuaba incurriendo en *overtime*. Sostuvo que dicho *overtime* no autorizado afectaba las finanzas del negocio y, demostraba un problema en su desempeño laboral al incumplir con las tareas delegadas a su cargo. Por otra parte, el gerente señaló que el recurrido culminaba su turno de trabajo con problemas en la limpieza de la tienda, *missing label*, cajas en el *topstock* sin *label* ni cantidad, paletas mixtas sin *binear*, paletas sin trabajar, notas en plan sin completar. A su vez, enfatizó que anteriormente se había dialogado al respecto. No obstante, no había tenido una mejoría en su desempeño. Posteriormente, el 23 de octubre de 2021, se le otorgó al señor Negrón el *Exit Interview* y fue despedido.

Nótese que, el señor Negrón firmó el primer, segundo y tercer escrito. Asimismo, realizó un plan de acción mediante el cual se comprometió a mejorar su desempeño laboral y cumplir con las labores designadas a su puesto. De igual forma, señalamos que dichas acciones disciplinarias se emitieron dentro del periodo de doce (12) meses. No obstante, este incumplió con ambos planes de

acción, lo que conllevó a su despido. Adicionalmente, destacamos que el recurrido recibió cuatro (4) hojas de notas o conversaciones documentadas en las siguientes fechas: 19 de marzo de 2021, 11 de agosto de 2020, 23 de enero de 2021 y 21 de septiembre de 2021. Surge de dichas hojas de notas que el Sr. Joel se reunió con el señor Negrón a los fines de dialogar sobre las fallas en el área de trabajo y las expectativas a cumplir en las labores asignadas a este. Nos parece meritorio señalar que dichas hojas de notas están firmadas por el Sr. Joel y el recurrido. En virtud de lo anterior, determinamos que Walmart presentó documentación suficiente para sostener que el despido del señor Negrón fue justificado.

De otra parte, surge de la deposición que el señor Negrón conocía la *Política de Acciones Disciplinarias* de la compañía y estaba familiarizado con dicha política a los fines de orientar a sus empleados. De igual forma, el recurrido reconoció que conocía el proceso de acción disciplinaria. Particularmente, el señor Negrón indicó lo siguiente:

> P. Sí, se va a marcar. Ya mismo cuando él lo identifique. Sería el uno. Esa copia es para usted, la así que... No, no, lo que quiero es que se familiarice con el documento don Juan no, no voy a pretender, verdad, que lo lea completo. Recuerde que no le voy a hacer preguntas concretas de contenido. Simplemente quiero que usted mire los documentos y me diga si los reconoce, si los reconoce, verdad. Por ejemplo, ¿ese que le estoy mostrando mire a ver si usted está de acuerdo conmigo en que lo que le estoy mostrando es el Manual del Asociado de Walmart? ¿Eso es el Manual del Asociado de Walmart, correcto, lo que le entregue?[10]
>
> R. Sí, es correcto.
>
> P. ¿Y ese manual usted, usted recibió copia de ese manual, correcto?
>
> R. Es correcto.
>
> P ¿Y usted como asistente de gerente supervisaba personal, correcto?
> R. Eso es correcto.

---

[10] Véase líneas 1-22 de la pág, 76 de la deposición del señor Negrón que se llevó a cabo el 7 de diciembre de 2023.

P. ¿Por lo tanto, usted estaba familiarizado con ese manual del asociado porque no solamente era aplicable a usted sino que era aplicable a sus supervisados, correcto?[11]

R. Es correcto.

P. ¿Y si usted, y si al..., algún asociado que usted supervisaba tenía alguna pregunta, eh, verdad, relacionada por ejemplo a normas de la compañía, pues, era importante que usted estuviese familiarizado con ese manual porque usted podía orientar a ese supervisado suyo sobre eso, correcto?

R. Es correcto.

P. ¿Y con la asistencia, claro está, de la gerente de Recursos Humanos de la tienda?

R. Correcto.

P. Correcto. ¿Y por ejemplo si usted, si, usted tenía que conocer este manual también porque si algún supervisado suyo se apartaba de las normas usted tenía como responsabilidad su..., disciplinarlo, correcto?[12]

R. Correcto.

P. ¿Y lo disciplinaba conforme a este manual?

R. Correcto.

P. Vamos a marcarlo como Exhibit Uno. ¿Y ese manual del asociado que se ha marcado como Exhibit Uno estaba en vigor, vigente a la fecha en que concluyó su empleo en Walmart, correcto?

R. Ahí no recuerdo.

P. "Okay". ¿Quién lo sabe sería la compañía?

R. Es correcto.

P. Está bien. Perfecto. Entonces, la compañía también aparte de ese, Manuel quédate con él, aparte de ese manual tenía y me di..., y dígame si estoy correcto o no, tenía una política de acciones disciplinarias, ¿correcto?[13]

R. Es correcto.

P. ¿Qué esencialmente constaba de un procedimiento de cuatro pasos, correcto?

R. Correcto.

---

[11] Véase líneas 1-20 de la pág, 77 de la deposición del señor Negrón que se llevó a cabo el 7 de diciembre de 2023.
[12] Véase líneas 1-22 de la pág, 78 de la deposición del señor Negrón que se llevó a cabo el 7 de diciembre de 2023.
[13] Véase líneas 1-22 de la pág, 79 de la deposición del señor Negrón que se llevó a cabo el 7 de diciembre de 2023.

P. ¿Cuáles eran los pasos de ese procedimiento de acción disciplinaria don Juan?

R. "Okay". Primero se comenzaba con una conversación, eh, donde se comen..., se documentaba. Luego comenzaba los primeros nive..., los niveles que era uno, dos, tres y el cuatro era despido.

P. Y el cuatro era el despido. ¿Mire a ver si el primer nivel se le conocía como, el primer paso, verdad, se le conocía como primer nivel de asesoría?

R. Es correcto.

P. ¿Y luego venía un segundo nivel de asesoría que incluía el que el empleado formulara un plan de acción?[14]

R. Eso es correcto.

P. ¿Y luego venía un tercer nivel de asesoría que también incluía el que el empleado formulara un plan de acción para corregir las deficiencias que se le señalaban?

R. Eso es correcto.

P. ¿Y finalmente si el empleado incurría en una falta o falla de desempeño adicional entonces venía el cuarto nivel que era el despido?

R. Eso es correcto.

P. Bien. ¿Y ese procedimiento usted lo conocía bien?

R. Es correcto.

P. Bien. ¿Y de hecho usted lo, también lo conocía que usted llego pasar a distintos supervisado suyos por ese procedimiento disciplinario, correcto?[15]

R. Es correcto.

P. Muy bien. Entonces, mire a ver si lo que le voy a mostrar ahora con las páginas numeradas quinientos ochenta y tres (583) a la quinientos ochenta y ocho (588) es esa política de acciones disciplinarias. Verifique a ver. Lo que le he mostrado y ha examinado señor, eh, Negrón es precisamente esa política de acciones disciplinarias que usted conocía, ¿correcto?

R. Correcto.

---

[14] Véase líneas 1-22 de la pág, 80 de la deposición del señor Negrón que se llevó a cabo el 7 de diciembre de 2023.
[15] Véase líneas 1-22 de la pág, 81 de la deposición del señor Negrón que se llevó a cabo el 7 de diciembre de 2023.

P. Bien. ¿Y esa que tiene ahí en su, verdad, de frente es la que estuvo en vigor desde diciembre del 2018, correcto?

R. Eso es correcto.

P. ¿Y a la fecha de conclusión de su empleo que fue en septiembre del 2021 esa política de los cuatros pasos estaba vigente?[16]

R. Estaba vigente.

P. Vamos a marcarla como Exhibit Dos. Entonces ahora don Juan le voy a mostrar un documento adicional, pero antes le pregunto, ¿usted está de acuerdo conmigo que Walmart tenía como política como, como estándar, eh, como política, verdad, el que se prohibía discriminar por sexo, por religión, por ideas políticas, por ideas religiosas, por impedimentos, por edad, por raza, por color, esa era política institucional de Walmart, correcto?

R. Correcto.

P. Bien. ¿Y eso estaba documentado a, esa política estaba por escrito incluso, correcto?[17]

R. Correcto.

P. Mire a ver si era a través de está, de este documento que yo le estoy mostrando ahora. Son las páginas numeradas quinientos ochenta y nueve (589) a la quinientos noventa y seis (596) de la producción de documentos de Walmart. Bien. Señor Negrón ese documento que acaba de examinar es precisamente la política de la que yo le hable, ¿correcto?

R. Correcto.

P. ¿Y esa política igual usted la conocía y estaba familiarizado con ella, correcto?

R. Correcto.

P. ¿De hecho usted tenía que asegurarse que los supervisados suyos no fueran discriminados por ninguna de las razones que dice esa política, correcto?[18]

R. Correcto.

P. ¿Y en efecto usted no discriminaba contra ellos por ninguna de esas razones?

R. Eso es correcto.

---

[16] Véase líneas 1-22 de la pág, 82 de la deposición del señor Negrón que se llevó a cabo el 7 de diciembre de 2023.
[17] Véase líneas 1-22 de la pág, 83 de la deposición del señor Negrón que se llevó a cabo el 7 de diciembre de 2023.
[18] Véase líneas 1-22 de la pág, 84 de la deposición del señor Negrón que se llevó a cabo el 7 de diciembre de 2023.

P. Bien. ¿Y si usted percibía que algún gerencial estaba discriminando contra un supervisado suyo por cualquiera de las razones que estaban ahí qué usted hubiese hecho si ese, si ese caso se hubiese dado, usted informaba a Recursos Humanos inmediatamente, correcto?

R. Eso es correcto.

P. ¿Y al gerente de la tienda también y a los "co-manager", correcto?

R. Correcto.

P. ¿Ese era deber suyo, era una responsabilidad suya?

R. Es correcto.

P. ¿Levantar bandera rápido e informarlo, correcto?[19]

R. Correcto.

P. ¿Por qué eso era intolerable?

R. Eso es correcto.

[...]

P. Mire ver si, eh, perdóneme un momento antes de entrar ahí. Quiero me diga si yo estoy correcto o no en que los gerentes de tienda, co-gerentes y asistentes de gerente todos pasan cada cierto tiempo por unos entrenamientos que tienen que ver con las políticas y procedimientos de empleo de la compañía, y son adiestramientos que los da el personal de Recursos Humanos de Walmart, ¿estoy correcto en eso?[20]

R. Sí, es correcto.

P. ¿Y usted recibió esos entrenamientos durante su empleo en Walmart, correcto?

R. Correcto.

P. ¿Y en esos entrenamientos se hablaba o se discutía con los gerenciales incluyendo los asistentes de gerente como usted las disposiciones del manual del asociado, de la, de la política anti-discrimen, de las políticas de acciones disciplinarias todo eso se discutía en esos entrenamientos, correcto?[21]

R. Correcto

---

[19] Véase líneas 1-22 de la pág, 85 de la deposición del señor Negrón que se llevó a cabo el 7 de diciembre de 2023.
[20] Véase líneas 1-22 de la pág, 94 de la deposición del señor Negrón que se llevó a cabo el 7 de diciembre de 2023.
[21] Véase líneas 1-22 de la pág, 95 de la deposición del señor Negrón que se llevó a cabo el 7 de diciembre de 2023.

Ahora bien, respecto a la causa de acción por Ley Núm. 100-1959, *supra*, el señor Negrón argumentó que luego de ser despedido sus tareas fueron asumidas y redistribuidas por cuatro (4) compañeros de trabajo que eran más jóvenes. Específicamente, presentó como único fundamento para sostener su reclamación por Ley Núm. 100-1959, *supra*, que los compañeros que lo sustituyeron eran más jóvenes. Sin embargo, de los documentos que acompañan la moción de sentencia sumaria y la oposición, surge que unos de los compañeros que lo sustituyó en sus labores fue Francisco Crespo quien nació en el 1695. Entiéndase, este es contemporáneo con el recurrido.

En lo pertinente a la controversia ante nuestra consideración, la causa de acción por la Ley Núm. 100-1959, *supra*, prohíbe el discrimen en el empleo de un patrono contra un empleado por razón de edad. Así pues, cuando el empleado alegue discrimen por edad, este tiene el deber de presentar prueba que establezca lo siguiente: (1) que pertenece a la clase protegida por la Ley Núm. 100-1979, *supra*, a saber, su edad; (2) que estaba cualificado para ejercer el puesto que ocupaba; (3) que fue despedido; (4) que fue sustituido por una persona más joven, esto es, algún hecho base que lo ubique dentro de la modalidad bajo la cual reclama. *Segarra Rivera v. Intl. Shipping et al.*, supra, págs. 989-990.

Cabe precisar que, el señor Negrón evidenció que pertenecía a la clase protegida por la Ley Núm. 100-1979, *supra*, ya que, es un hecho incontrovertido que, en el momento de su despido, este tenía 56 años. De igual forma, quedó demostrado que este último estaba cualificado para ejercer su puesto. Por otra parte, es un hecho incontrovertido que el señor Negrón fue despedido de su empleo el 28 de septiembre de 2021. Sin embargo, el recurrido no logró probar que en efecto su puesto fue sustituido por una persona más joven. Aclaramos que, de los documentos presentados por las

partes, surge que las funciones del señor Negrón fueron redistribuidas entre varios empleados de la compañía. Entre ellos, Xavier Crespo quien tenía la misma edad que el señor Negrón. Nótese, además, que este no fue sustituido por un empleado más joven, si no que sus tareas fueron distribuidas entre otros empleados. Por tanto, resolvemos que no procede su reclamación, toda vez que carece de prueba suficiente que nos permita concluir que el despido fue discriminatorio por razón de edad.

Cónsono con lo anterior, es forzoso concluir que el señor Negrón no presentó prueba suficiente que controvirtiera los hechos propuestos por Walmart en su solicitud de sentencia sumaria. Entiéndase, este no incluyó prueba que demostrara hechos controvertidos y, que nos movieran a determinar que el despido del señor Negrón fue injustificado o discriminatorio por razón de edad. Es meritorio señalar que este llevó a cabo un patrón de desempeño laboral deficiente e insatisfactorio en el área de trabajo. Por tanto, la razón para separar al recurrido de su empleo estuvo dirigida a mantener el buen funcionamiento de la compañía y, no por intención discriminatoria.

Por todo lo anterior, resolvemos que los hechos propuestos por Walmart, en conjunto con los hechos estipulados por las partes en el *Informe de Conferencia con Antelación a Juicio* eran suficientes para determinar que no hubo un despido injustificado al amparo de la Ley Núm. 80, *supra*, ni un despido discriminatorio por razón de edad. Considerando lo anterior, concluimos que existe prueba suficiente para determinar que en el presente caso hubo un despido justificado, ya que se probó que el recurrido incumplió en varias ocasiones con las políticas de la empresa e incumplió con las tareas asignadas a su puesto. Es decir, que el despido no se dio por el mero capricho del patrono, sino que fue producto de un desempeño insatisfactorio por parte del señor Negrón. Consecuentemente

colegimos que el segundo, tercero y quinto señalamiento de error no se cometieron.

Respecto al primer y cuarto señalamiento de error, Walmart arguyó que el TPI erró al emitir una resolución denegando la moción de sentencia sumaria a solo horas de haberse presentado dicha moción. A su vez, mediante el cuarto señalamiento de error planteó que el TPI incidió al requerir a las partes la presentación del informe de conferencia con antelación a juicio. Ello, a pesar, de que el peticionario adelantó que iba a presentar una moción de sentencia sumaria. Aclaramos que, no es necesario atender dichos señalamientos de error, puesto que atendimos la moción de sentencia sumaria en sus méritos.

Consecuentemente, procede desestimar el caso de epígrafe, toda vez que no procede una causa de acción por Ley Núm. 100, *supra*, y Ley Núm. 80, *supra*.

IV.

Por los fundamentos antes expuestos, expedimos el auto de *certiorari*, **revocamos** el dictamen recurrido y, en consecuencia, se desestima la *Querella* objeto del presente recurso de *certiorari*.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones